RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0166p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

THOMAS E. KILLION et al.,

        *Plaintiffs-Appellants,*

    v.

KeHE DISTRIBUTORS, LLC,

        *Defendant-Appellee.*

Nos. 13-3357/4340

---

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:12-cv-00470; 3:12-cv-01585—Jack Zouhary, District Judge.

Argued: June 18, 2014

Decided and Filed: July 30, 2014

Before: SILER, GILMAN, and GIBBONS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Robert A. Bunda, BUNDA, STUTZ & DEWITT, PLL, Perrysburg, Ohio, for Appellants. Cardelle B. Spangler, WINSTON & STRAWN LLP, Chicago, Illinois, for Appellee. **ON BRIEF:** Robert A. Bunda, Barbara E. Machin, BUNDA, STUTZ & DEWITT, PLL, Perrysburg, Ohio, Kerry L. Morgan, Randall A. Pentiuk, PENTIUK, COUVREUR & KOBILJAK, P.C., Wyandotte, Michigan, for Appellants. Cardelle B. Spangler, WINSTON & STRAWN LLP, Chicago, Illinois, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. The plaintiffs in this case are numerous "sales representatives" who are or were employed by KeHE Distributors, LLC, a food distributor based

1

in Naperville, Illinois. KeHE's management assigns each representative several stores of large chain retailers. At their assigned stores, the representatives are responsible for stocking shelves as well as reordering merchandise whenever a store is low on any of KeHE's products. In 2012, KeHE discharged a number of the plaintiffs as part of a restructuring. Four of the discharged plaintiffs sued, claiming that KeHE had failed to pay them overtime wages as required by the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*

The plaintiffs sought to certify a collective action under 29 U.S.C. § 216(b). In response, KeHE argued that many of the discharged employees had waived their right to participate in a collective action by agreeing to such a waiver in their separation agreements, and that, in any event, the plaintiffs are exempt from the overtime provisions of the FLSA because they are classified under the statute as "outside sales employees."

The district court upheld the validity of the waivers and certified a collective action consisting only of employees who had not signed the agreements or who had modified their agreements to preserve their right to participate in a collective action. A motion for reconsideration by the plaintiffs followed. The court denied the motion, and the plaintiffs sought an interlocutory appeal (Case No. 13-3357). With that appeal pending, the district court granted summary judgment for KeHE, holding that all of the plaintiffs were outside sales employees and therefore exempt from the overtime requirements of the FLSA. A second appeal to this court followed (Case No. 13-4340).

For the reasons set forth below, we **DISMISS** the plaintiffs' interlocutory appeal (Case No. 13-3357) for lack of jurisdiction, but we **AFFIRM IN PART** and **REVERSE IN PART** the judgment of the district court based on the second Notice of Appeal (Case No. 13-4340). We hold that the district court erred in granting KeHE summary judgment on the outside-sales-exemption issue and further erred in excluding from the collective action those KeHE employees who had signed the waivers. With regard to a final issue raised by the plaintiffs concerning the exclusion of a report by their expert witness, however, we hold that the district court did not abuse its discretion.

# I. BACKGROUND

**A.      Factual background**

KeHE is a distributor of specialty ethnic and health foods to retailers, some of which are independent stores and some of which are large chain stores.  According to the Notice of Collective Action, the plaintiffs are current and former "sales representatives" of KeHE "who, since March 1, 2009, spent a majority of their work hours providing promotional services to KeHE's large retail chain customers in the Great Lakes Region, such as Meijer, Kroger, Giant Eagle and Walmart."

KeHE's relationships with the chain stores involve multiple layers of personnel. Typically, KeHE's customer-development team establishes the initial relationship with such a store.  The business-development team then negotiates the broad parameters of any overarching distribution contract.  In turn, KeHE's account-management team negotiates with the chain store the list of products from KeHE's 40,000-plus product catalog that are authorized for sale at each of the customers' stores.  Account managers also help each store develop a "plan-o-gram" that will best promote the KeHE products to be sold.  A "plan-o-gram" is essentially a marketing plan for the particular store that designates shelf spaces, identifies which products are to be placed on the shelves, and lays out any in-store advertising plans.  The account-management team then instructs the sales representatives on the requirements of the store.  Account managers also execute "force outs" on occasion, meaning that they instruct the sales representatives to place certain products or additional products for sale at the stores.

The sales representative is the on-the-ground contact for each individual store.  Sales representatives meet KeHE's delivery trucks several times per week, oversee the unloading of products into the store's backroom, and then return to the store several times during the week to stock KeHE's products on the shelves from the inventory in the backroom.  They also place orders for more products based on depleted inventory, meaning that, in general, the sales representatives are to order one additional case of products when the store has only one or two units remaining.  Finally, the sales representatives are responsible for transporting any damaged products back to KeHE's storage areas in their personal vehicles.

KeHE selects its sales representatives based on their sales experience, and the plaintiffs initially believed that their jobs would in fact entail sales. In addition to their responsibilities with chain retailers, sales representatives are permitted to cold-call on smaller independent retailers and solicit them to purchase KeHE products. The solicitation of such customers, however, is primarily the responsibility of KeHE's "Alternative Channel Department."

Sales representatives are paid entirely on commission through a formula that KeHE's documents describe as "a variable compensation plan where they are paid for two types of services, ordering and stocking." During the earlier part of the time period in question, from 2009 to 2011, the plan was byzantine to say the least, involving a ten-step calculation complete with discounts, mark-downs, and a calculation of profit margins on various products. By April 2011, however, KeHE appears to have simplified the system and began paying the sales representatives commissions of 2% for stocking products on shelves, 1.4% for store maintenance, 1% for promotional marketing (but only in independent stores), .75% for maintaining proper inventory levels that are ordered automatically through KeHE's own systems or the customer's computer systems, .10% for orders written by the sales representatives in question, .25% for marking prices on the items (but only in the states requiring that products be marked), .25% for rotating stock and processing credits, .15% for checking in delivered products, and .10% for adjusting invoices if they are short, or if products are damaged.

KeHE's sales representatives stated in their affidavits that they regularly work in excess of 60 hours per week to complete their above-described responsibilities. But KeHE does not pay the plaintiffs overtime because it classifies its sales representatives as exempt from the overtime requirements of the FLSA under the "outside sales employee" exemption, 29 U.S.C. § 213(a)(1).

On February 17, 2012, KeHE discharged 69 sales representatives in the Great Lakes Region in "a restructuring effective March 17, 2012." KeHE notified the affected representatives by mail and included in the mailing a separation agreement. The agreements promised the affected employees a retention bonus of $2,000 in exchange for continuing their work through March 17, 2012 and the employees' agreement to "release all claims against [KeHE] arising out of [their] employment with the Company." In addition, the agreements purportedly bound the employees "not to consent to become[ ] a member of any class or

collective action in a case in which claims are asserted against the Company that are related in any way to [their] employment or the termination of [their] employment with the Company."

**B.      Procedural background**

Thomas Killion and Brion Haley filed this lawsuit on February 27, 2012 in the Northern District of Ohio. They claimed that KeHE violated the FLSA by failing to pay them overtime wages even though they regularly worked in excess of 40 hours per week. A similar lawsuit brought by Barney Dolan and Mark Walters was consolidated with the lawsuit brought by Killion and Haley.

In March 2012, Killion and Haley moved to conditionally certify a collective action under the FLSA. They proposed to include in the lawsuit all KeHE sales representatives employed between February 27, 2009 and the date of filing. The plaintiffs also moved to void the collective-action waivers in the severance agreements for those who had signed them. With these motions pending, Anthony Basnec consented to join the collective action.

The district court issued an initial order determining that those plaintiffs who had modified their agreements by excising the waiver portion could join in the collective action. Two months later, the district court issued another order refusing to void the language waiving the right to participate in a collective action by those who had signed unmodified separation agreements. The court also dismissed Basnec from this lawsuit because he had signed a separation agreement containing the waiver. Shortly thereafter, the district court refused the plaintiffs' request that it certify an interlocutory appeal on the validity of the waivers.

The district court then conditionally certified a collective action "of KeHE sales representatives who, since March 1, 2009, spent a majority of their work hours providing promotional services to KeHE's large retail chain customers in the Great Lakes Region." This prompted Dolan, Haley, Killion, and Walters to move for reconsideration of the earlier order enforcing the collective-action waiver contained in the separation agreements.

In December 2012, the district court denied the motion for reconsideration. Two weeks later, Dolan, Haley, Killion, and Walters filed a "Petition for Review" in this court. A panel of this court construed the "Petition for Review" as a notice of appeal from the district court's order

denying the plaintiffs' motion for reconsideration.  That appeal is now before us as Case No. 13-3357.

While the foregoing interlocutory appeal was pending in this court, the district court granted KeHE summary judgment on the merits of the plaintiffs' FLSA overtime claims.  It held that the plaintiffs were properly classified as outside sales employees and therefore exempt from the overtime requirements of the FLSA.  The plaintiffs, including Basnec, then timely filed a second Notice of Appeal.  They challenge the district court's grant of summary judgment for KeHE on the overtime issue, its decision to enforce the collective-action waiver, and its decision to exclude the report of the plaintiffs' expert witness.  All three of these issues will be considered in turn.

## II.  LEGAL STANDARDS

### A.     Standard of review

We review de novo a district court's order granting summary judgment.  *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012), *cert. denied*, 134 S. Ct. 296 (2013).  Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  No genuine dispute of material fact exists when the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Ultimately the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986).  We must draw all reasonable inferences in favor of the nonmoving party in conducting our review.  *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013).

Collective-action certification rulings under the FLSA are reviewed under the abuse-of-discretion standard.  *White*, 699 F.3d at 873.  "A court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact."  *Jones v. Ill. Cent. R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010).

**B.      The FLSA**

This case arises under the FLSA.  As the Supreme Court recently explained in *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012):

> Congress enacted the FLSA in 1938 with the goal of "protect[ing] all covered workers from substandard wages and oppressive working hours."  *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 739, 101 S. Ct. 1437, 67 L. Ed.2d 641 (1981); see also 29 U.S.C. § 202(a).  Among other requirements, the FLSA obligates employers to compensate employees for hours in excess of 40 per week at a rate of 1 ½ times the employees' regular wages.  See § 207(a).

*Id.* at 2162.

As part of these overtime protections, the FLSA sets out the means for procuring relief.  The FLSA provides that "[a]n action to recover the liability [for unpaid overtime pay] prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  "Similarly situated persons are permitted to 'opt into' the suit.  This type of suit is called [a] 'collective action.'  It is distinguished from the opt-out approach utilized in class actions under Fed.R.Civ.P. 23."  *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006).

We begin our analysis by considering whether the district court properly granted KeHE's motion for summary judgment on the outside-sales-employee issue.  Because we conclude that the district court erred in granting KeHe's motion, we will next consider the validity of the collective-action waivers.  Finally, we will take up the issue regarding the district court's decision to exclude the report of the plaintiffs' expert witness.

### III.  THE OUTSIDE-SALES-EMPLOYEE EXEMPTION

**A.      Background**

The plaintiffs claim that KeHE failed to pay them overtime as required by § 207(a) of the FLSA.  KeHE responds that the plaintiffs are exempt from § 207(a) because each qualifies as an "outside salesman" under 29 U.S.C. § 213(a)(1).  This is the crux of the parties' dispute.

In *Christopher*, 132 S. Ct. at 2162–63, the Supreme Court set out the relevant legal background as follows:

> The overtime compensation requirement [of the FLSA] does not apply with respect to all employees. See § 213. As relevant here, the statute exempts workers "employed ... in the capacity of outside salesman." § 213(a)(1).

> Congress did not define the term "outside salesman," but it delegated authority to the [Department of Labor (DOL)] to issue regulations "from time to time" to "defin[e] and delimi[t]" the term. *Ibid.*

The Court also set forth the background of three of the regulations issued by the DOL:

> Three of the DOL's regulations are directly relevant to this case: §§ 541.500, 541.501, and 541.503. We refer to these three regulations as the "general regulation," the "sales regulation," and the "promotion-work regulation," respectively.

> The general regulation sets out the definition of the statutory term "employee employed in the capacity of outside salesman." It defines the term to mean "any employee ... [w]hose primary duty is ... making sales within the meaning of [29 U.S.C. § 203(k)]" and "[w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." §§ 541.500(a)(1)–(2). The referenced statutory provision, 29 U.S.C. § 203(k), states that " '[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." Thus, under the general regulation, an outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.

> The sales regulation restates the statutory definition of sale discussed above and clarifies that "[s]ales within the meaning of [29 U.S.C. § 203(k)] include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property." 29 C.F.R. § 541.501(b).

> Finally, the promotion-work regulation identifies "[p]romotion work" as "one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed." § 541.503(a). Promotion work that is "performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work," whereas promotion work that is "incidental to sales made, or to be made, by someone else is not exempt outside sales work." *Ibid.*

(Footnotes omitted.)

In addition to the regulations identified by the Supreme Court in *Christopher*, two other DOL regulations bear on the present case. The first is 29 C.F.R. § 541.700, which instructs that

[t]o qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. . . .  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* § 541.700(a).  "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee."  *Id.* § 541.700(b).

Also relevant to this case is 29 C.F.R. § 541.504, titled "Drivers who sell," which both parties agree provides a close analogy to the considerations at issue.  That regulation specifies as follows:

(a) Drivers who deliver products and also sell such products may qualify as exempt outside sales employees only if the employee has a primary duty of making sales.  In determining the primary duty of drivers who sell, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including loading, driving or delivering products, shall be regarded as exempt outside sales work.

(b) Several factors should be considered in determining if a driver has a primary duty of making sales, including, but not limited to: a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales.

*Id.* § 541.504(a), (b).  The Supreme Court has also instructed that "exemptions in the Fair Labor Standards Act are to be narrowly construed against the employers seeking to assert them." *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 879 n.7 (2014) (internal quotation marks omitted).

This court has addressed the general regulation on outside-sales employees only once.  In *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377 (6th Cir. 1970), the court considered the applicability of the outside-sales-employee exemption to a cola-bottling company's "routemen."

*Id.* at 383. The routemen serviced retail outlets and vending machines along routes delineated by the bottler. Of the sales to retailers, approximately 60% were attributable to chain stores. The bottler entered contracts with such chain stores at a higher management level—generally between store managers and the bottler's route managers. In turn, the "routemen's function inside the store ordinarily [was] to survey the shelves allocated to his products, determine how many cases would be needed to refill them, and then restock the shelves accordingly from the stock carried on his truck." *Id.* at 379–80.

Based on these facts, this court concluded that the routemen were not outside sales employees within the meaning of the FLSA. *Id.* at 383. The *Hodgson* court first noted that "[t]here [was] no evidence that routemen participate in or influence the initial decision to buy or the volume of purchases." *Id.* And once management made the initial purchasing decision,

> [e]vidence shows that the bulk of the routemen's time in servicing the retail chain accounts, which amount to 60 per cent of appellee's annual dollar volume, consists essentially of restocking the shelves and removing empties on a regular weekly basis in each store on the route. The familiarity of most drivers with the probable needs of each store on their routes enables them to stock their trucks accordingly in advance of calling on the stores. Thus, the routemen do not solicit orders and return with stock; they restock a volume requirement initially determined by the customer without their intervention.

*Id.*

The *Hodgson* court also emphasized that the employer offered "no evidence that [the routemens'] solicitations [of additional shelf space] ever affected [sic] a significant increase in sales to a store independently of significant increases in consumer demand for appellee's products or the presence of an advertising promotion authorized by the chain which required additional stock." *Id.* Finally, the court noted that "it cannot be said on the evidence that the regular job of the routemen was to open up new accounts." *Id.* at 384. This fact, too, militated against applying the overtime exemption to the routemen. *Id.* Against this background, we now turn to the facts of the present case.

**B.     Application**

This case turns on two questions:   (1) do the plaintiffs make sales, and, (2) if so, is making sales their primary duty?  We conclude that the district court committed two major errors in answering these questions.  First, the district court erroneously concluded that the plaintiffs' reordering of merchandise constitutes a "sale" for FLSA purposes as a matter of law.  Second, the district court incorrectly held that there is no genuine dispute of material fact as to whether making sales is the primary duty of the plaintiffs.  We will now discuss the evidence on both questions that necessitates a jury trial.

### 1.  *Do the plaintiffs make sales?*

#### a.  **Christopher*'s import*

KeHE, in line with the analysis of the district court, argues that *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012), compels the conclusion that the plaintiffs made "sales" within the meaning of the FLSA.  We disagree.  *Christopher* required the Supreme Court "to decide whether the term 'outside salesman,' as defined by the Department of Labor . . . , encompasses pharmaceutical sales representatives." *Id.* at 2161.  Specifically, the case posed the question of whether "nonbinding commitments from physicians to prescribe [certain] prescription drugs in appropriate cases" constituted a "sale" for FLSA purposes. *Id.*

The Supreme Court first noted that the FLSA states that the term "'[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." *Id.* at 2176 (quoting 29 U.S.C. § 203(k)) (alterations in original).  Focusing on the term "other disposition," the Court reasoned that, "we are hard pressed to think of any contract for the exchange of goods or services in return for value or any firm agreement to buy that would not also fall within [the Act's] specifically enumerated categories." *Id.* at 2171.  Accordingly, the Court concluded that "'other disposition' is most reasonably interpreted as including those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity." *Id.* at 2171–72.  It then determined that "in the unique regulatory environment within which pharmaceutical companies must operate," "[o]btaining a nonbinding commitment from a physician to prescribe one of respondent's drugs" would constitute a sale for FLSA purposes. *Id.* at 2172.

The present case does not involve a "unique regulatory environment." Nor does this case involve the term "other disposition," such as a "nonbinding commitment." We therefore find *Christopher* of limited import to the questions that this case poses. With that in mind, we turn to the question of who actually sells KeHE's products for FLSA purposes.

### b.  A jury could conclude that the plaintiffs do not make sales

Four sets of employees are involved in selling KeHE's products: (1) the customer-development team that establishes the initial relationship with a store; (2) the business-development team that negotiates the broad parameters of the overarching distribution contract; (3) the account managers, who determine which products will be sold in the chain stores and who are responsible for growing sales and presenting everything that is needed to increase those sales; and (4) the sales representatives, who provide store support by determining the quantities of KeHE products to be ordered and who write and transmit orders for subsequent delivery in order to maintain proper inventory levels. In addition, sales representatives cold-call on independent stores and choose the mix of KeHE products to be sold there.

Although the plaintiffs input orders for KeHE's products, they presented substantial evidence that the KeHE account managers actually control the volume through "plan-o-grams" and restrictions on reordering. KeHE's "Sales Rep Expectations and Goals" document bolsters the plaintiffs' argument by noting that on "90% of all items, your reorder points will be 1 to 2 units." Deposition testimony further indicates that the plaintiffs are generally unsuccessful in soliciting more shelf space (and thus more orders) because they are typically limited to displays prearranged and "plan-o-grammed" by KeHE's account manager for that particular chain store. As one witness put it, his "shelf strip couldn't change until corporate would change it."

A jury could conclude from this evidence and deposition testimony that the plaintiffs do not actually make KeHE's sales. The fact that the plaintiffs hit the order buttons on their electronic devices, in other words, is not enough to magically transform their jobs from inventory management to "sales." This court's decision in *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377 (6th Cir. 1970), emphasized that the defendant offered "no evidence that [the routemens'] solicitations [of additional shelf space] ever affected [sic] a significant increase in sales to a store independently of significant increases in consumer demand for appellee's products or the

presence of an advertising promotion authorized by the chain which required additional stock." *Id.* at 383. The evidence here is, at the very least, in conflict on this point. We therefore conclude that the district court erred in determining that the plaintiffs make "sales" as a matter of law.

### 2. Is making sales the plaintiffs' primary duty?

Even assuming arguendo that the plaintiffs' reordering activities are "sales" within the meaning of the FLSA, the question remains as to whether such "sales" are their primary duty. Three major considerations work to the plaintiffs' advantage.

First, it appears that the vast majority of the plaintiffs' time is spent stocking and cleaning shelves. "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b). According to memos drafted by KeHE's management, the plaintiffs' jobs consist of (1) "Ordering," meaning that sales representatives are "to write orders which maintain proper inventory levels"; (2) "Stocking of Product," meaning that the sales representatives are to keep the product "in neat straight rows. Product to the front edge and evenly faced to the minimum depth of 3 units. . . . Labels faced forward, and all products dusted when stocking and conditioning."; (3) maintaining "Backroom Conditions," meaning that sales representatives replenish the backroom stock at least weekly; (4) "Control of Dates," meaning that sales representatives ensure that expired products are not on the store's shelves); (5) "Reconciliation of Invoices," meaning the adjustment of invoices if they are short; and (6) "Bottom of Invoice," meaning that sales representatives are to review products that the store has run out of and determine what adjustments are necessary.

From this broad range of responsibilities alone, a jury could conclude that making sales is not the primary responsibility of the plaintiffs. Further, the district court observed that the "Plaintiffs spent the majority of their time on tasks other than writing orders." This finding militates against exempting the sales representatives from the FLSA's overtime requirements.

Second, the plaintiffs' compensation is primarily based on stocking shelves. Since April 2011, KeHE's sales representatives are paid commissions of 2% for stocking products on

shelves, 1.4% for store maintenance, 1% for promotional marketing (but only in independent stores), .75% for maintaining proper inventory levels that are ordered automatically through KeHE's own systems or the customer's computer systems, .10% for orders written by the sales representatives in question, .25% for marking prices on the items (but only in the states requiring that products be marked), .25% for rotating stock and processing credits, .15% for checking in delivered products, and .10% for adjusting invoices if they are short, or if products are damaged.

The plaintiffs are thus paid 68% of their total compensation for stocking shelves and store maintenance (3.4% out of 5%). This fact could permit a jury to conclude that the plaintiffs' primary responsibility is inventory management rather than sales.

Third, the evidence indicates that even if the foregoing activities are considered "promotional work" within the meaning of 29 C.F.R. § 541.503, this work could be seen to be in furtherance of sales made by the account managers rather than in furtherance of the plaintiffs' own sales. Whether promotional work is exempt outside-sales work depends on whether the work "is actually performed incidental to and in conjunction with an employee's *own* outside sales or solicitations" or is instead "incidental to sales made, or to be made, by *someone else*." 29 C.F.R. § 541.503(a) (emphases added).

KeHE's own internal documents offer evidence that the sales representatives' promotional activities are actually directed at increasing sales by the account managers. For example, one internal memorandum instructs the sales representatives to "Manage your accounts *as if* you owned them." (emphasis added) This memorandum accords with deposition testimony indicating that account managers "are responsible for growing sales and presenting everything that is needed to grow those sales." From this evidence, a jury could conclude that the plaintiffs' promotional work was not done in support of their own outside sales, but instead in support of the account managers' sales.

Subsection (c) of 29 C.F.R. § 541.503 addresses a hypothetical situation involving

a company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases. The arrangement of

merchandise on the shelves or the replenishing of stock is not exempt work unless it is incidental to and in conjunction with the employee's own outside sales.

On remand, a jury should determine whether the arrangement of merchandise on the shelves and the replenishing of stock by the plaintiffs is "incidental to and in conjunction with [their] own outside sales," s*ee id*. § 541.503(a), or is in furtherance of the sales by someone else. The district court erred in concluding that the plaintiffs' promotional work was in support of their own sales as a matter of law.

### 3. *The district court erroneously discounted 29 C.F.R. § 541.504*

In determining whether the plaintiffs make sales and whether such sales are the plaintiffs' primary duty, the district court refused to consider the "Drivers who sell" regulation, 29 C.F.R. § 541.504, and evidence related to the nine factors identified therein. The plaintiffs contend that this was error. We agree. And KeHE appears to agree as well. KeHE relies heavily upon *Ackerman v. Coca-Cola Enterprises, Inc.*, 179 F.3d 1260 (10th Cir. 1999), to assert that the plaintiffs made sales and that they were outside-sales employees. Central to the *Ackerman* court's evaluation of these issues was its determination that "[t]he plaintiffs . . . resemble the exempt 'driver salesman' identified in 29 C.F.R. § 541.505(d) [now codified at 29 C.F.R. § 541.504]." *Ackerman*, 179 F.3d at 1266. We thus have little difficulty in concluding that the district court should have taken 29 C.F.R. § 541.504 into account in this case and considered evidence relevant to the factors identified therein. (Neither party contends that the regulation is controlling, and we need not decide its exact scope in this case.)

According to 29 C.F.R. § 541.504(b), "[s]everal factors should be considered in determining if a driver has a primary duty of making sales." Those factors are

> a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales.

29 C.F.R. § 541.504(b).

A brief evaluation of several of these factors yields conflicting determinations. With regard to "customary or contractual arrangements concerning amounts of products to be delivered," the account managers determine which of KeHE's 40,000 products will be sold in the chain stores. And after the account managers make this determination, the district court found that the plaintiffs "typically based [reordering decisions] on a product's anticipated sales [where] KeHE had a suggested ordering guideline known as 'case plus two' for slower selling items, which meant representatives were advised to order more product when only two items remained on the shelf."

> This situation is addressed in 29 C.F.R. § 541.504(d)(2):

> Drivers who generally would not qualify as exempt outside sales employees include: . . . A driver who often calls on established customers day after day or week after week, delivering a quantity of the employer's products at each call when the sale was not significantly affected by solicitations of the customer by the delivering driver or the amount of the sale is determined by the volume of the customer's sales since the previous delivery.

So too here. This consideration therefore militates against exempting the plaintiffs from the FLSA's overtime requirements.

On the other hand, several factors identified by 29 C.F.R. § 541.504(b) favor KeHE. For example, "the employer's specifications as to qualifications for hiring" works to KeHE's benefit. The district court determined that "[w]hen Plaintiffs were hired, they generally understood they were accepting a sales position and thought their prior sales experience helped them get the job with KeHE."

On remand, the district court should entertain evidence regarding as many of the nine factors identified in 29 C.F.R.§ 541.504(b) as it determines are relevant to this case. And a jury should determine which way these factors tilt.

### 4. *KeHE's reliance on* **Ackerman v. Coca-Cola Enterprises** *is unavailing*

KeHE resists the conclusion that the § 541.504(b) factors raise a jury issue and argues that *Ackerman* holds to the contrary. We reject this contention for two reasons. First, *Ackerman* is a Tenth Circuit case with facts very similar to those in *Hodgson v. Klages Coal & Ice Co.*,

435 F.2d 377 (6th Cir. 1970). To the extent that *Ackerman* differs from this court's decision in *Hodgson*, we are bound to follow *Hodgson*. KeHE argues that "*Hodgson* is inapposite because the regulatory scheme involved was specific to driver salesmen and does not apply to the general outside sales exemption." But *Ackerman* also involved the driver-salesmen regulation. *See* 173 F.3d at 1266–67. Furthermore, unlike in this case and unlike in *Hodgson*, the *Ackerman* court found "no evidence in the record that sales of Coca-Cola products at stores visited by the plaintiffs were made by any other Coca-Cola employees." *Id.* at 1266. KeHE's reliance on *Ackerman* is thus unavailing in light of *Hodgson*.

We also question KeHE's reliance on *Ackerman* for a second reason. The Tenth Circuit decided *Ackerman* in 1999. But the Department of Labor promulgated the current version of 29 C.F.R. § 541.504 in 2004. Until 2004, the regulation governing "Driver salesmen" was codified at 29 C.F.R.§ 541.505 and stated that "a determination of whether the driver is actually employed for the purpose of, is customarily and regularly engaged in, and has as his chief duty and primary function the making of sales, *may* involve consideration of such factors as" those codified under the regulation. *Id.* § 541.505(e) (1973) (emphasis added). The 2004 amendments altered this language so that it now states that these factors "*should* be considered in determining if a driver has a primary duty of making sales." 29 C.F.R. § 541.504 (emphasis added). This change is an indication of the Department of Labor's intent to require the courts to consider all of the nine factors identified by the regulation—something that *Ackerman* did not do. *Compare Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 583–84 (5th Cir. 2013) (considering each of the nine factors identified by 29 C.F.R. 541.504(b)), *with Ackerman*, 179 F.3d at 1267–68 (considering only some of the factors delineated by 29 C.F.R. 541.505(e) (1999)). This point need not be decided in the present case, however, because we agree with both parties that the regulation offers only persuasive rather than controlling authority with regard to the facts before us.

In sum, to the extent that *Ackerman* conflicts with *Hodgson*, we are bound to follow *Hodgson*. And to the extent that *Ackerman* did not consider the applicability of each of the nine factors identified in 29 C.F.R. § 541.504(b), we have doubts that *Ackerman* remains good law. *Ackerman* therefore at most suggests that the district court should consider evidence relevant to

the nine factors identified in 29 C.F.R. § 541.504(b).  We have already determined that the district court should take this course on remand.  Accordingly, we find *Ackerman* of little persuasive value with regard to this case.

**C.    Conclusion**

"Whether employees are exempt from the requirements of the [FLSA] is primarily a question of fact."  *Hodgson*, 435 F.2d at 382.  "An employer seeking an exemption from the overtime requirements of the [FLSA] must prove that each employee is entitled to the exemption by plain and unmistakable evidence."  *Id.*  Because the evidence could allow a jury to find that the plaintiffs did not make sales or that making sales was not their primary duty, we cannot resolve this issue as a matter of law; instead, a jury must make this evaluation.  In doing so, the jury should consider as many of the nine factors identified in 29 C.F.R. § 541.504(b) as the district court determines are relevant to this case.

## IV.  VALIDITY OF THE COLLECTIVE-ACTION WAIVERS

The plaintiffs also appeal the district court's order refusing to reconsider its August 3, 2012 ruling that conditionally certified the plaintiffs' collective action.  They argue that the court improperly excluded employees who had signed unmodified separation agreements that purported to "give up any right to become . . . a member of any class or collective action in a case in which claims are asserted against [KeHE] that are related in any way to [their] employment or the termination of [their] employment with the Company."

KeHE responds that we lack jurisdiction over this issue because conditional-certification orders are not collaterally appealable, that the plaintiffs lack standing to assert the rights of those not part of the conditionally certified collective action, and that, in any event, the separation agreements are valid contracts.  We will first consider whether we have jurisdiction and will then address the merits of the issue.

**A.**    **Jurisdiction**

*1. Appellate jurisdiction*

Title 28, section 1291 of the United States Code grants this court jurisdiction over "final decisions of the district courts."  Notwithstanding this general rule, a party may appeal decisions that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

"[A] conditional [certification] order approving notice to prospective co-plaintiffs in a suit under § 216(b) [of the FLSA] is not appealable."  *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 549 (6th Cir. 2006).  And the district court's denial of the plaintiffs' motion for reconsideration does not alter this conclusion.  "The denial of a motion to reconsider an earlier order is not an immediately appealable collateral order because it does not conclusively determine the disputed question, it merely resolves whether to revisit an important issue rather than the issue itself, and it is reviewable following final judgment."  *United States v. Gomez-Gomez*, 643 F.3d 463, 469 (6th Cir. 2011).  This rule of procedure applies even when the underlying order for which the party seeks reconsideration would itself have been collaterally appealable.  *Id.*  We therefore dismiss Case No. 13-3357 because we lack jurisdiction over that interlocutory appeal.

Nonetheless, we have jurisdiction to consider the validity of the waivers under the second Notice of Appeal, Case No. 13-4340, which was filed on November 6, 2013.  "[W]e will entertain arguments on all objections and asserted errors prior to the final disposition of a case if a party indicates in its notice of appeal that it appeals either the final judgment or the final order in the case."  *Caudill v. Hollan*, 431 F.3d 900, 906 (6th Cir. 2005).

Rule 3(c)(1)(B) of the Federal Rules of Appellate Procedure specifies that the notice of appeal must "designate the judgment, order, or part thereof being appealed."  This court has interpreted Rule 3(c)(1)(B) to mean that "[a]n appeal referencing an order that directs entry of

judgment in a case is a sufficient equivalent to appealing the judgment itself, even though the judgment is entered as a separate document." *Caudill*, 431 F.3d at 905.

The plaintiffs' Notice of Appeal filed after final judgment appeals "from The Memorandum, Opinion and Order Granting Defendant Summary Judgment and Granting Defendant's Motion to Exclude Expert Report entered in this action on the 9th day of October, 2013." That order "grant[ed] Defendant's Motion for Summary Judgment . . . and enter[ed] final judgment in favor of Defendant." Plaintiffs' Notice of Appeal therefore qualifies as an appeal from the final judgment, permitting us to entertain appellate jurisdiction over the order conditionally certifying plaintiffs' collective action. *See Caudill*, 431 F.3d at 904. Accordingly, we have jurisdiction to consider the collective-action waivers.

### 2. *Standing*

KeHE next argues that the plaintiffs who modified their severance agreements to exclude the collective-action waiver or who did not sign the severance agreement at all lack standing to appeal on behalf of those whom the district court excluded from the collective action. The plaintiffs respond that they have standing to assert that employees who signed unmodified separation agreements should be allowed to opt in to the collective action because the FLSA gives employees the right "to bring a collective action on behalf of others, and thus to assert claims, such as the invalidity of the waivers, on behalf of their fellow workers." This court has not yet addressed whether employees in a collective action may assert the rights of those excluded from the lawsuit.

We have no need to decide that issue here because jurisdiction exists by virtue of the fact that the second Notice of Appeal was brought in part by plaintiff Basnec. Basnec had signed an unmodified separation agreement, causing the district court to dismiss him from the collective action. Accordingly, Basnec has standing to challenge the validity of the collective-action waiver that he signed.

### B.     Validity of the waivers

This brings us to the merits regarding the validity of the unmodified collective-action waivers. The plaintiffs argue that this court's decision in *Boaz v. FedEx Customer Information*

*Services, Inc.*, 725 F.3d 603 (6th Cir. 2013), controls because it holds that an employee will not be bound by a contract entered into with his employer that has the effect of limiting his rights under the FLSA. In response, KeHE argues that cases upholding agreements that require employees to submit to arbitration on an individual basis are more on point. No court of appeals appears to have squarely addressed this issue outside of the arbitration context.

This court's decision in *Boaz* provides the relevant framework for the issue before us. In *Boaz*, the plaintiff-employee signed an employment agreement that contained a provision requiring her to bring any legal action against the defendant-employer within "6 months from the date of the event forming the basis of [the] lawsuit." *Id.* at 605. When the plaintiff filed an FLSA lawsuit after the six-month time period had elapsed, the defendant moved for summary judgment, arguing that her claims were untimely under the employment agreement.

This court disagreed. It first noted that "[s]hortly after the FLSA was enacted, the Supreme Court expressed concern that an employer could circumvent the Act's requirements—and thus gain an advantage over its competitors—by having its employees waive their rights . . . to minimum wages, overtime, or liquidated damages." *Id.* at 605–06. The *Boaz* court concluded that because the waiver of the statutory-limitations period would have deprived the plaintiff of her FLSA rights, the provision was invalid. *Id.* at 606. It also rejected the defendant's argument that a plaintiff may waive procedural rights under the FLSA, just not substantive ones. *Id.* Finally, the court distinguished cases enforcing an employee's agreement to arbitrate his or her claims on an individual basis due to the strong federal presumption in favor of arbitration. *Id.* at 606–07 (distinguishing *Floss v. Ryan's Family Steak Houses Inc.*, 211 F.3d 306 (6th Cir. 2000), on that basis).

*Boaz* therefore implies that a plaintiff's right to participate in a collective action cannot normally be waived. The court clearly said that "[a]n employment agreement cannot be utilized to deprive employees of their statutory [FLSA] rights." *Id.* (alteration in original) (internal quotation marks omitted). And "Congress has stated its policy that ADEA plaintiffs [and thus FLSA plaintiffs because the statutory language is identical] should have the opportunity to proceed collectively." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). We have little reason to think that the right to participate in a collective action should be treated any

differently than the right to sue within the full time period allowed by the FLSA.  The concern, *Boaz* explained, is that "an employer could circumvent the Act's requirements—and thus gain an advantage over its competitors—by having its employees waive their rights under the Act." 725 F.3d at 605.

We are aware, of course, that the considerations change when an arbitration clause is involved.  *Boaz* explained that "an employee can waive his right to a judicial forum only if the alternative forum allow[s] for the effective vindication of [the employee's] claim." *Id.* at 606–07 (alteration in original) (internal quotation marks omitted).  Arbitration, it noted, is such a forum. *Id.* at 606.  But this line of precedents is of only minimal relevance here because the plaintiffs' collective-action waivers in this case contained no arbitration clause.  And, in any event, none of our precedents permitting arbitration of FLSA claims has addressed employees' collective-action rights.

KeHE nonetheless points to cases from other circuits enforcing agreements to arbitrate FLSA claims on an individual basis.  As KeHE notes, the Eleventh Circuit recently addressed the jurisprudence of the courts of appeals on collective-action waivers in the arbitration context in *Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326 (11th Cir. 2014).  It determined that

> all of the circuits to address this issue have concluded that § 16(b) does not provide for a non-waivable, substantive right to bring a collective action.  *See Sutherland v. Ernst & Young LLP,* 726 F.3d 290, 296–97 & n. 6 (2d Cir. 2013) (determining that the FLSA does not contain a "contrary congressional command" that prevents an employee from waiving his or her ability to proceed collectively and that the FLSA collective action right is a waivable procedural mechanism); *Owen* [*v. Bristol Care, Inc.*]*,* 702 F.3d [1050,] 1052–53 [(8th Cir. 2013)] (determining that the FLSA did not set forth a "contrary congressional command" showing "that a right to engage in class actions overrides the mandate of the FAA in favor of arbitration"); *Carter v. Countrywide Credit Indus., Inc.,* 362 F.3d 294, 298 (5th Cir. 2004) (rejecting the plaintiffs' claim that their inability to proceed collectively deprived them of a substantive right to proceed under the FLSA because, in *Gilmer* [*v. Interstate/Johnson Lane Corp.*, 500 U.S. 29 (1991)], the Supreme Court rejected similar arguments regarding the ADEA); *Adkins* [*v. Labor Ready, Inc.*]*,* 303 F.3d [496,] 503 [(4th Cir. 2002)] (determining that a plaintiff failed to point to any "suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a non-waivable right to a class action under that statute" and that the plaintiff's "inability to bring a class action, therefore, cannot by itself suffice to defeat the strong congressional preference for an arbitral forum"); *cf. D.R. Horton* [*v. NLRB*], 737 F.3d [344,] 362

[(5th Cir. 2013)] (determining that the National Labor Relations Act does not contain a contrary congressional command overriding the application of the FAA).

*Id.* at 1336. The Eleventh Circuit then joined this emerging consensus. *Id.* Crucially, however, the respective waiver agreements in all of the above-cited cases included provisions subjecting the employees to arbitration. *See Walthour*, 745 F.3d at 1330 (noting the existence of an arbitration agreement between the parties); *Sutherland*, 726 F.3d at 296 (same); *Owen*, 702 F.3d at 1052 (same); *Carter*, 362 F.3d at 298 (same); *Adkins*, 303 F.3d at 498 (same).

These circuit decisions, in turn, rely on the Supreme Court's decisions in *Gilmer*, 500 U.S. at 35 ("We conclude that Gilmer has not met his burden of showing that Congress, in enacting the ADEA, intended to preclude arbitration of claims under that Act."), and *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2309 (2013) (holding that "[n]o contrary congressional command requires us to reject the waiver of class arbitration here"). *See Walthour*, 745 F.3d at 1331 (citing *Gilmer* and *Italian Colors*); *Sutherland*, 726 F.3d at 296 (quoting *Italian Colors*); *Carter*, 362 F.3d at 298 (citing *Gilmer*); *Adkins*, 303 F.3d at 502 (citing *Gilmer*). Accordingly, none of the foregoing authorities speak to the validity of a collective-action waiver outside of the arbitration context.

Because no arbitration agreement is present in the case before us, we find no countervailing federal policy that outweighs the policy articulated in the FLSA. The rationale of *Boaz* is therefore controlling. *Boaz* is based on the general principle of striking down restrictions on the employees' FLSA rights that would have the effect of granting their employer an unfair advantage over its competitors. Requiring an employee to litigate on an individual basis grants the employer the same type of competitive advantage as did shortening the period to bring a claim in *Boaz*. And in cases where each individual claim is small, having to litigate on an individual basis would likely discourage the employee from bringing a claim for overtime wages. *Boaz* therefore controls the result here where arbitration is not a part of the waiver provision.

## V.  EXCLUSION OF THE REPORT OF THE PLAINTIFFS' EXPERT WITNESS

In addition to the more determinative issues discussed above, the plaintiffs argue that the district court abused its discretion when it struck the report of their expert witness, Karen

Dulaney Smith, whom the plaintiffs termed a "liability expert." The district court decided that the report "reads as a legal brief" and therefore "runs afoul of the Sixth Circuit's guidance in *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994), which permits experts to opine on and embrace factual issues, not legal ones." (Dist. Court Op. at 18). We will briefly address the plaintiffs' objection.

This court reviews the district court's evidentiary rulings under the abuse-of-discretion standard. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). Generally, "[r]elevant evidence is admissible." Fed. R. Evid. 402. And expert witnesses

> may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony may also "embrace[] an ultimate issue." Fed R. Evid. 704(a). It may not, however, "define legal terms." *Berry*, 25 F.3d at 1353.

We conclude that the district court did not abuse its discretion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), when it excluded the report in question. *Daubert* interpreted Rule 702 of the Federal Rules of Evidence to permit a district court to perform a "gatekeeping" function with regard to expert testimony, a function not limited solely to scientific testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999). This function is, fundamentally, "to decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Id.* at 156 (internal quotation marks omitted).

The district court acted within its discretion when it concluded that the expert's report in this case offers no such specialized knowledge. Among the report's contents is the recitation of legal principles, which is not appropriate expert testimony. *See Berry*, 25 F.3d at 1353. And the

discussion of interviews with several of the plaintiffs is hearsay admissible only on cross-examination, s*ee* Fed. R. Evid. 703, and presumably cumulative of the witnesses' eventual first-hand testimony. This leaves only a cursory analysis of how the plaintiffs spent their working time as gathered from the interviews. Under these circumstances, we find no abuse of discretion in the district court's conclusion that the expert's analysis is not the kind of specialized knowledge that would assist the jury.

The district court also did not abuse its discretion when it determined that Smith's report runs afoul of *Berry*. Although the report contains permissible conclusions embracing the ultimate issue, it also contains impermissible legal conclusions. The report seeks to define the term "incidental," for example, and then opines that "[t]he[ non-exempt] work was not incidental to the sales representatives making their own sales." Likewise, the report seeks to compare "[t]he specific issues that are explored in this case" with issues "raised to the Administrator during the rule making process for the 2004 revision." Finally, the report seeks to  characterize the Department of Labor's view of the regulations defining outside sales.

These are plainly attempts to define legal terms. Although these references do not comprise the majority of the report, they are sufficient to support the conclusion that the district court acted within its discretion in excluding the same. *See Summerland v. Cnty. of Livingston*, 240 F. App'x 70, 81 (6th Cir. 2007) ("Therefore, because experts may only state[ ] opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue[,] and because Donaldson's report goes beyond this point (many times over), the district court's decision to strike his entire report was not erroneous.") (alteration in original) (internal quotation marks omitted).

## VI. CONCLUSION

For all of the reasons set forth above, we **DISMISS** the plaintiffs' interlocutory appeal (Case No. 13-3357) for lack of jurisdiction, but we **AFFIRM IN PART** and **REVERSE IN PART** the judgment of the district court based on the second Notice of Appeal (Case No. 13-4340). We hold that the district court erred in granting KeHE summary judgment on the outside-sales-exemption issue and further erred in excluding from the collective action those KeHE

employees who had signed the waivers. With regard to the exclusion of the report by the plaintiffs' expert witness, however, we hold that the district court did not abuse its discretion.