RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0286p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DAVINA HURT and DOMINIC HILL, individually and on behalf of all others similarly situated,

> *Plaintiffs-Appellees*,

*v.*

No. 18-4058

COMMERCE ENERGY, INC., doing business as Just Energy doing business as Commerce Energy of Ohio, Inc.; JUST ENERGY MARKETING CORP.; JUST ENERGY GROUP, INC.,

> *Defendants-Appellants*.

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:12-cv-00758—James S. Gwin, District Judge.

Argued: October 24, 2019

Decided and Filed: August 31, 2020

Before: CLAY, STRANCH, MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Shannon K. Patton, LITTLER MENDELSON, P.C., Cleveland, Ohio, for Appellants. Nicole T. Fiorelli, DWORKEN & BERNSTEIN CO., L.P.A., Painesville, Ohio, for Appellees. **ON BRIEF:** Shannon K. Patton, Robert M. Wolff, Edward H. Chyun, Alex R. Frondorf, LITTLER MENDELSON, P.C., Cleveland, Ohio, Bradley A. Sherman, SHERMAN BOSEMAN LEGAL GROUP, LLC, Cleveland, Ohio, for Appellants. Nicole T. Fiorelli, Patrick J. Perotti, Frank A. Bartela, DWORKEN & BERNSTEIN CO., L.P.A., Painesville, Ohio, for Appellees.

STRANCH, J., delivered the opinion of the court in which CLAY, J., joined. MURPHY, J. (pp. 19–37), delivered a separate dissenting opinion.

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge. The Fair Labor Standards Act provides minimum wage and overtime protections to a broad range of employees. Davina Hurt and Dominic Hill brought claims for themselves and others alleging that their positions are covered by the protections of the FLSA and parallel provisions of Ohio law. They challenge their designation by Defendants as "outside salesman," a category that is "exempt" from the FLSA, which means that their position is not covered by the protections of the Act. A trial was held and the jury found that Plaintiffs were not exempt outside salespeople. Just Energy appeals that determination and challenges pre- and post-trial rulings made by the district court, certain instructions given to the jury, and evidentiary rulings made by the court. For the reasons explained below, we **AFFIRM**.

## I. BACKGROUND

### A. Factual Background

Plaintiffs worked for a group of affiliated energy supply companies that provide electric power and natural gas to residential and commercial customers in the United States and internationally, collectively referred to as Just Energy. Just Energy operates in the U.S. through licensed subsidiaries and is the parent company of a number of businesses, including Defendants Commerce Energy, Inc. and Just Energy Marketing Corp. Commerce Energy, Inc. is the licensed subsidiary in Ohio, California, Georgia, Maryland, Massachusetts, New Jersey, and Pennsylvania, and Just Energy Marketing Corp. hired Plaintiffs to go door-to-door to solicit customers on behalf of Commerce Energy.

Plaintiffs worked as door-to-door solicitors and spent most of their working hours in the field seeking to convince customers to buy electricity and natural gas products. Just Energy paid them exclusively on a commission basis without paying overtime or minimum wage, and the actual hours and pay for each worker varied. Plaintiffs were not required to have any sales experience or level of education; they were required only to go through an orientation and a sales

training course.  Plaintiffs also signed Just Energy's independent contractor agreements (the "Agreement") that set out confidentiality, non-disparagement, non-exclusive, and non-compete clauses.

Plaintiffs were typically required to attend daily morning meetings at Just Energy's facility before going into the field.  They were driven to the field in teams led by Just Energy supervisors; any work breaks were controlled by those supervisors.  The Agreement states that there are no minimum number of hours or minimum number of contracts that must be solicited.  Some Plaintiffs testified they were required to work on specific days and hours, and would be reprimanded if they did not work as specified.  Plaintiffs could not choose where they worked; they were directed to certain neighborhoods by the supervisors and given maps with highlighted streets showing where they were required to work for the day.

When in the field, Plaintiffs were mandated to adhere to a dress code, including wearing a shirt that properly and prominently displays the company's name and logo, and were subject to rules set out in a contractor compliance matrix, which lists the feedback potential customers might give about their interactions with the workers and the disciplinary consequences for such feedback.  For their solicitation, Plaintiffs were instructed to follow a script verbatim.  When a potential customer became interested in Just Energy's products, Plaintiffs filled out a "customer agreement" and obtained the customer's signature.  Some Plaintiffs referred to this as an "application"; it was non-binding and did not finalize the transaction.

Plaintiffs were directed to place a verification call from the customer's premises for a third party to confirm that the customer entered into the agreement voluntarily and with full understanding of its terms.  Plaintiffs had to initiate the call to the third-party verifier using the customer's telephone and were required to leave the premises before the customer spoke to the verifier.  Plaintiffs were not allowed to return or speak to the customer after the call.  This was an important requisite of the job: the compliance matrix reserves the most severe consequence of termination for a solicitor who remains present at the consumer's premise during the verification call, uses his or her cell phone to conduct the call, or returns to the customer's premises within seven days after the call.  The Ohio Public Utilities Commission (PUCO) requires procedures for door-to-door energy solicitors, including independent third-party verification for 50% of

customers, but the universal verification process for Just Energy's customers was required as part of a 2010 settlement agreement between the company and PUCO.

The sale was not final after the third-party verification call. Instead, the customers went through a credit check, and after that, Just Energy could approve the application and finalize the sale or choose to reject the application. The signed customer agreement specifies that the contract is conditional upon Just Energy's acceptance, at its sole discretion. Just Energy had "unfettered discretion to reject any energy contract submitted" by Plaintiffs. Some applications were rejected for failed credit checks, but Plaintiffs frequently were not told why applications were rejected and their commissions not paid. Plaintiffs had no role in Just Energy's decision-making, and because their contact with the customer ended after they had to leave the premises, they were not allowed to engage in customer service or address any customer concerns—customers were instructed to call a separate customer service line with any questions. Trial testimony indicates that Just Energy exercised its discretion to reject applications frequently. Though a satisfactory third-party verification call and a successful credit check were essential, ultimately approval depended on the exercise of discretion by Just Energy and was required before an application generated by Plaintiffs became final and they could receive and retain their commission.

Plaintiffs submitted documentary evidence of compensation for members of the class. Exhibits in the record include two spreadsheets that summarize the total compensation of Plaintiffs who worked varying lengths of time between 2010 and 2014. Of the 3,840 total individuals with compensation data available in the spreadsheets, 214 made no money at all. 69% of the individuals made under $1,000 in total compensation and 62% of the individuals made under $500.

Individual plaintiffs testified to their earnings. One made only $1,200 over three or four months, while another made only $196 while working 12- to 14-hour days, six to seven days a week for about two months. Other plaintiffs earned nothing—one never received a commission even after working six to seven days a week for at least a month and turning in three to five signed customer agreements to Just Energy every day, and another earned nothing even after working long days for two weeks, knocking on over 100 doors each day. Yet another worked

11-hour days, six days a week for a month, and testified that he "only made enough really to pay for the uniform" and that he "didn't even get any check stubs or anything" from Just Energy.

## B. Procedural History

Plaintiffs filed a complaint in 2012 alleging that Just Energy misclassified its door-to-door solicitors as outside salespeople in order to qualify for an exemption from the Fair Labor Standards Act (FLSA) and the Ohio Minimum Fair Wage Standards Act (OMFWSA). Plaintiffs sought to certify the FLSA claim as a collective action and the OMFWSA claim as a class action. In 2013, the district court granted conditional certification of the FLSA collective action to workers who performed services in the last three years for Commerce Energy, Just Energy's licensed subsidiary operating in Ohio; it granted class certification for the OMFWSA claim to Ohio workers who performed services for Commerce Energy since March 2009. The court denied Just Energy's summary judgment motion, and in September 2014, the case went to a bifurcated jury trial on the question of Just Energy's liability.

Prior to trial, Just Energy filed a motion in limine to exclude evidence of Plaintiff's compensation; the district court denied the motion and admitted compensation evidence over Just Energy's objection. At trial, over Just Energy's objection, the district court instructed the jury on the law governing the outside sales exemption to the wage and hour requirements of the FLSA. The court asked the jury "to consider the extent to which the employee has the authority to bind the company to the transaction at issue" and whether "the employer retains and/or exercises discretion to accept or reject any transactions for reasons that are unrelated to regulatory requirements applicable to the industry."

The jury found Just Energy liable for minimum wage and overtime pay under the FLSA and the OMFWSA on the basis that Plaintiffs were not exempt outside salespeople. The district court denied Just Energy's motions for directed verdict and judgment as a matter of law. Just Energy now challenges the denial of summary judgment, directed verdict, and judgment as a matter of law, as well as the jury instructions and the admission of compensation evidence at trial. Just Energy contends that Plaintiffs were exempt from the FLSA and the OMFWSA under the outside sales exemption as a matter of law.

## II.  ANALYSIS

### A.  Standard of Review for Summary Judgment and Trial Motions

Appeals of summary judgment denials after a full trial on the merits are generally precluded, though the Supreme Court has acknowledged a possible exception for "'purely legal' issues capable of resolution 'with reference only to undisputed facts.'" *Ortiz v. Jordan*, 562 U.S. 180, 188–190 (2011).  To determine whether Plaintiffs were outside salespeople, we need to consider not just the statute and regulations, but also facts such as the details of Plaintiffs' door-to-door soliciting activities and the process of making and finalizing sales.

The dissent bases its review on the premise that the facts here are "largely undisputed" and from that conclusion argues that whether Plaintiffs were outside salespeople is a purely legal question for the district court and not the jury.  It is true that how workers spend their working time is a question of fact, and "whether their particular activities exclude[] them from [FLSA protections] is a question of law." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).  Whether such a mixed question of law and fact is treated as a legal question or a factual question depends "on whether answering it entails primarily legal or factual work." *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).

At the summary judgment stage there existed a number of disputed issues of material fact about the relationship between Plaintiffs and Defendants, including the level of supervision and independence Plaintiffs had in the field, the particular requirements on work hours, breaks, assignments, and solicitation locations, and the sales completion procedures of Defendants.  Determining whether Plaintiffs were exempt requires findings on these relevant disputed facts and is therefore a question properly before the jury. *See, e.g.*, *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991); *Lilley v. BTM Corp.*, 958 F.2d 746, 750 n.1 (6th Cir. 1992).  The question presented is not a purely legal issue capable of resolution with reference only to undisputed facts as noted in *Ortiz.*  Review on appeal of the district court's denial of summary judgment is not appropriate.

We review de novo the denial of Just Energy's motions for judgment as a matter of law and directed verdict based on the outside sales exemption. *Finn v. Warren County*, 768 F.3d

441, 450 (6th Cir. 2014). "The motion may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012) (quoting *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007)).

**B. Outside Sales Exemption**

Plaintiffs brought minimum wage and overtime claims under the FLSA and overtime claims only under the OMFWSA. The OMFWSA is a "general law involving the concern of the state for all of its citzens" that requires "major employers in Ohio, public and private," to pay minimum wages and overtime pay for certain types of employees. *Wray v. City of Urbana*, 440 N.E.2d 1382, 1383 (Ohio Ct. App. 1982). For the purposes of this appeal, we need only analyze the FLSA claims because the OMFWSA incorporates the FLSA's exemptions. Ohio Rev. Code § 4111.03. The Ohio law "parallels the FLSA," and courts therefore "approach the issues raised on appeal in a unitary fashion." *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 69 n.2 (6th Cir. 1997).

The FLSA contains an exemption from its overtime and minimum wage protections for workers "employed . . . in the capacity of outside salesman." 29 U.S.C. § 213(a)(1). To show that workers are exempt from FLSA protections, "the employer bears not only the burden of proof, but also the burden on each element of the claimed exemption." *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004) (citing *Douglas*, 113 F.3d at 70).

Our review of the applicability of this FLSA exemption is governed by the statutory language, Department of Labor (DOL) regulations, caselaw, and particular facts of the case. The Supreme Court has provided guidance on how courts are to evaluate this exemption: "the statute's emphasis on the 'capacity' of the employee counsels in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161 (2012). Thus, we look to the nature of the industry as well as the particulars of the workplace in which the employees perform their services.

The statute employs but does not specifically define the term "outside salesman" (or salesperson), but courts look to how the term has been "defined and delimited from time to time by regulations of the [Department of Labor]." 29 U.S.C. § 231(a)(1); *see also Christopher*, 567 U.S. at 147. The DOL has issued three regulations relevant to the "outside sales" exemption, 29 C.F.R. § 541.500, 29 C.F.R. § 541.501, and 29 C.F.R. § 541.503. Section 541.500 defines an outside salesperson as someone "customarily and regularly engaged away from the employer's place or places of businesses," whose primary duty is either 1) "making sales" or 2) "obtaining orders or contracts for services." Section 541.501 further clarifies the definition of "making sales" and "obtaining orders or contracts for services," and Section 541.503 distinguishes exempt promotional work of outside salespeople from non-exempt promotional work incidental to sales made by someone else.

In *Christopher*, the Supreme Court summarized the statute and DOL regulations: "[A]n outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 567 U.S. at 148. The definition of "sale" is broad, and the list of transactions defining a "sale" in the regulations represents "an attempt to accommodate industry-by-industry variations in methods of selling commodities." *Id.* at 163–64. The Court considered guidance on the scope of the exemption in DOL reports and the preamble to the latest regulations, cautioning that exempt status should not depend on technicalities, such as "whether it is the sales employee or the customer who types the order into a computer system and hits the return button" or whether the order is filled by a jobber rather than directly by the employer. *Id.* at 149.

### 1. Making Sales

We begin with whether Plaintiffs' duties constitute "making sales" as defined by 29 C.F.R. § 541.500. The procedures for solicitation that Plaintiffs were required to follow started with offering an application or customer agreement for Just Energy's services and then assisting potential customers to complete the form. A signed agreement did not finalize the transaction for Just Energy products, but Plaintiffs were mandated to cease all involvement in the process after the application was prepared and the verification call was initiated. Plaintiffs had to leave the customer's premises at the beginning of the call or face the possibility of termination.

From the other side, each customer had to successfully complete the verification call and pass a credit check. Even then, Just Energy retained, and frequently exercised, ultimate discretion on whether to finalize or refuse the application.

At trial, the jury found that Just Energy did not satisfy its burden to demonstrate that Plaintiffs were outside salespeople and found Defendants liable for violating the FLSA and the OMFWSA. The district court denied their motions for directed verdict and judgment as a matter of law, finding that there was sufficient evidence to support the jury's determination that the outside sales exemption did not apply to Plaintiffs.

Just Energy argues that because *Christopher*'s detailers were considered outside salespeople when they obtained "non-binding commitments" from physicians to prescribe their drugs, 576 U.S. at 147, "authority to bind" should not be a component of the test for "making sales." But the Court found that the pharmaceutical detailers in *Christopher* were exempt from the FLSA because:

> [o]btaining a nonbinding commitment from a physician to prescribe one of respondent's drugs is the most that [the detailers] were able to do to ensure the eventual disposition of the products that respondent sells. This kind of arrangement, in the *unique regulatory environment* within which pharmaceutical companies must operate, comfortably [fits under the exemption].

*Id.* at 165 (footnote omitted and emphasis added). *Christopher* addressed the specific parameters of work in the unique regulatory environment of the pharmaceutical industry. Its conclusion that pharmaceutical detailers who cannot obtain binding commitments are "making sales" does not necessarily apply to other industries.

We, and other circuits, have recognized the unique factual setting and the limitations of *Christopher* in resolving outside sales exemption claims in other industries. In *Killion v. KeHE Distributors, LLC*, we explained the path followed by the Court through the "unique regulatory environment" governing pharmaceutical companies and found *Christopher* to be of "limited import." 761 F.3d 574, 583–84 (6th Cir. 2014). We reversed summary judgment that had applied the exemption to sales representatives of a food distributor because, though the plaintiffs entered orders from individual stores, the account managers controlled the volume and placed restrictions on the orders allowed. *Id.* at 584. Similarly, the Fifth Circuit in *Meza v. Intelligent*

*Mexican Mktg., Inc.* noted that *Christopher* "offers little guidance as to how a court determines if a driver is a deliveryman or a salesman for FLSA purposes" because it dealt with pharmaceutical sales representatives.  720 F.3d 577, 586 (5th Cir. 2013).

The unique regulatory environment of the pharmaceutical industry makes evident why *Christopher*'s holding does not readily transfer to other industries.  Both drug companies and their detailers are prohibited from selling prescription drugs directly to patients: the ultimate discretion to complete a sale rests elsewhere—with a prescribing physician.  *Christopher*, 567 U.S. at 150 & n.4.  No such regulatory environment prevents direct energy sales.  Just Energy sales had requirements of its own making, such as third-party verifications for all potential customers based on its individual settlement agreement with Ohio PUCO,  but no regulations prohibited direct sales or required Just Energy itself to retain full discretion to finalize a sale.  Plaintiffs' lack of authority to finalize the transactions is significant when reviewing the facts under a "functional, rather than formal, inquiry . . . in the context of the particular industry in which the employee works."  *Id.* at 161.

The fact that Just Energy retained discretion to finalize the sale is not merely a technicality immaterial to the analysis.  *Id.* at 149.  Plaintiffs' customer agreements, sometimes referred to as "applications," were rejected frequently by Just Energy, and Plaintiffs often were not told the reason for the rejection, though it directly impacted if and how much they were paid.  Once the verification phone call began, these Ohio Plaintiffs had no ability to personally follow-up, answer questions and assuage concerns, or confirm the transaction with the customer.  No regulatory environment prohibited the solicitors from controlling and completing the sale directly to customers.  The dissent analogizes the nonbinding agreements here to the nonbinding sales of products that are subject to supply availabilities and customer return policies, or bulk orders that must be completed by purchasing retailers.  Even assuming that the salespeople in these situations qualify for the exemption under the FLSA, they are distinguishable from Plaintiffs here because Just Energy itself, not the purchasers as part of a regulation or policy, controls the finalization of sales.  Plaintiffs could not finalize customer agreements and complete sales due to Just Energy's choice to retain ultimate discretion and to require certain solicitation procedures at its Ohio workplace.

In *Killion*, we reversed summary judgment in favor of the distributor because a jury could conclude that the plaintiffs did not actually make sales. 761 F.3d at 584–85. Similarly, Plaintiffs here communicated with potential customers, convinced them to try Just Energy products, and inputted their information onto the agreement. But Just Energy retained discretion over completion of sales, just as the account managers in *Killion* could restrict and control the volume of orders. It was appropriate for the jury and now this court to consider Just Energy's retention of discretion over completion of sales as a factor in determining whether Plaintiffs were making sales.

Our conclusion is supported by *Clements v. Serco, Inc.*, where the Tenth Circuit held that mere soliciting or inducing applications is not making sales, especially if the employer retains discretion and implements other requirements to complete the transaction. 530 F.3d 1224, 1229 (10th Cir. 2008) Though the *Clements* court noted that the "touchstone for making a sale . . . is obtaining a commitment," *id.* at 1227, it found that civilian military recruiters are not outside salespeople because they "could only lay the groundwork. It was the Army—and only the Army—who could enlist a recruit," *id.* at 1229. Plaintiffs' jobs are comparable to those of the civilian recruiters in *Clements* because they "could only lay the groundwork" but not complete the sale.

Finally, Just Energy argues that this case should be controlled by *Flood v. Just Energy Marketing Corp.*, in which the Second Circuit considered FLSA and state law claims by door-to-door solicitors against the same parent entity, Just Energy, and affirmed summary judgment in favor of Just Energy. 904 F.3d 219 (2d Cir. 2018). Just Energy argues that here too "making sales" must focus on "whether the employee has obtained a commitment to buy the employer's product." *Id.* at 232. But *Flood*'s emphasis on the commitment to buy is grounded in its factual setting, and, as *Christopher* establishes, other factors must also be considered.[1]

---

[1]Appellants also cite as supplemental authority two Department of Labor opinion letters finding the outside sales exemption applicable to two specific factual scenarios. The DOL there applied an analysis that is consistent with our discussion of *Christopher* and other precedent above, which governed our analysis in the factual setting of this case.

Based on *Flood*, our dissenting colleague concludes that our decision is wrong because these cases present an all or nothing proposition: either all employees of the topmost parent corporation, Just Energy, receive FLSA protection or none should.  But that ignores the fact-intensive inquiry required by and the employee-protective purpose of the FLSA and the OMFWSA.  It also ignores the distinct parties in the cases: here, Commerce Energy of Ohio, Inc.; in *Flood*, Just Energy New York Corp.  It is true that both cases share defendants—the same ultimate parent corporation, Just Energy, sits atop the complex structure of subsidiaries— so there will be some overlap in method or procedures.  But how the New York subsidiary chooses to operate its worksite does not tell us how the Ohio subsidiary must necessarily operate its worksite.  And a suit brought in Ohio against the Ohio subsidiary may find its workplace operation to be covered by FLSA protections without creating a circuit split, even if the workplace operation of the New York subsidiary is exempt.  A comparison of these two cases shows that no circuit split exists.

*Flood* involved a separate group of licensed Just Energy subsidiaries that operated in New York at a worksite that functioned very differently from Plaintiffs' worksite.  There, if a solicitor convinced a potential buyer to fill out the customer agreement, the third-party verification call was initiated and the solicitor waited outside the customer's immediate presence.  *Id.* at 225.  If the verifier provided a confirmation number to the customer, the solicitor reengaged with the customer at this "critical point of the sale," and added the number to the agreement.  *Id.*  The solicitor was told "to confirm the program details" and "ensure that the customer has no further questions."  *Id.*  The solicitor then "close[d] the sale by giving the customer all the paperwork."  *Id.*  He was "the last person to sell a customer," and no one else made sales after him.  *Id.*

Here, the evidence at trial shows that the procedures governing the interaction between the door-to-door solicitors and the customers were significantly different at the Ohio workplace. The Ohio affiliate of Just Energy did not allow Plaintiffs to "close the sale," or provide confirmation and answers to customer questions or concerns at the "critical point of the sale." Plaintiffs' contact with the customers ended upon initiating the verification call, on pain of termination.  Customers were instructed to direct any questions or concerns to Just Energy's

customer service. Wage issues, which the minimum wages requirements of the FLSA seek to address, also highlight the distinctions between the workplaces. The lead plaintiff in *Flood* earned more than $70,000 in commissions per year, was eligible to earn residual payments, and received incentive awards for travel around the world. *Flood,* 904 F.3d at 226. In contrast, testimony revealed that one Ohio plaintiff made only $1,200 over three or four months, while another made only $196 while working 12- to 14-hour days, six to seven days a week for about two months. And others testified to making nothing at all, even after working 11- to 12- hour days, six to seven days a week for several weeks. Of the 3,840 total individuals with compensation data available in the trial spreadsheets, 69% of the individuals made under $1,000 in total compensation and 62% of the individuals made under $500. In sum, Plaintiffs had significantly less control over their work, sale methods, and compensation than the New York solicitors. *Flood* is distinct both in its procedural posture and in the factual setting that controlled whether solicitors were in fact authorized or allowed to make sales. *Flood* does not control the outcome of this case.

This appeal challenges the determination of the jury following trial that Defendants are liable to Plaintiffs under the FLSA. Based on the evidence before it, the jury found that Plaintiffs were not "making sales" and were not exempt outside salespeople. This decision accords with the language of the FLSA and the regulations of the DOL. Our precedent and that of our sister circuits also support this conclusion. Viewing the entire record in the light most favorable to Plaintiffs, as we must, we cannot say that reasonable minds could have come to only one conclusion—a decision in favor of Defendants that Plaintiffs were "making sales." Therefore, the district court properly denied Just Energy's motions for judgment as a matter of law and for directed verdict.

### 2. Obtaining Orders or Contracts for Services

Having determined that Plaintiffs were not "making sales," we turn to whether Plaintiffs were "obtaining orders or contracts for services." 29 C.F.R. § 541.500. Just Energy argues on appeal that we should find Plaintiffs to be outside salespeople as a matter of law because they were obtaining orders or contracts for services. At issue is whether Just Energy's business was selling services. The Agreement between Just Energy and Plaintiffs clearly states that Just

Energy "is engaged in the business of selling (or soliciting the sale of) consumer products (natural gas and electricity)," and testimony from Just Energy representatives confirms that gas and electricity are "commodities." We have also held that electricity is a commodity. *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 800 (6th Cir. 2012) (holding that electricity is a commodity for the purposes of the Robinson-Patman Act, which prohibits price discrimination between different purchasers of commodities for those engaged in commerce). The electricity and natural gas that Just Energy sells to customers are commodities. Plaintiffs were not "obtaining orders or contracts for services."

### 3. External Indicia and Apparent Purpose of the FLSA Exemption

We turn next to the external indicia of salespeople and the apparent purpose of the FLSA exemption. Just Energy argues that these are not appropriate considerations or are at best a secondary analysis of the outside sales exemption. As already explained, we review Defendants' motions for judgment as a matter of law and for directed verdict de novo, applying "the same deferential standard as the district court: 'The motion may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party.'" *Radvansky*, 496 F.3d at 614 (quoting *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001)).

In analyzing the outside sales exemption, the Supreme Court has considered the "external indicia of salesmen," which include: whether the workers were hired for their sales experience, whether they were trained to obtain the maximum commitment possible, whether they worked away from the office with minimal supervision, and whether they were rewarded with incentive compensation. *Christopher*, 567 U.S. at 165–66. Even though the Court considered these indicia as part of its conclusion that pharmaceutical detailers conducted more atypical sales work (qualifying as "other disposition" under the definition of "sale" in the statute, 29 U.S.C. § 203(k)), it did not limit the indicia analysis to exempt salespeople who fall under the catchall sales category of "other disposition." *See id.* at 164–66. We apply these indicia to the practices and procedures of Plaintiffs' Ohio workplace.

Plaintiffs were not hired for their sales experience—*no* experience was required. They were required to report to the office each day before going to work in the field, where they were closely supervised. The supervisors controlled Plaintiffs' daily schedules, including selecting the streets on which they were to work. Just Energy mandated that workers follow a detailed script in their presentations to potential buyers and enforced a compliance matrix that governed discipline and employment itself. The script instructed Plaintiffs to get customers to commit to Just Energy products, but unlike the detailers in *Christopher*, they were not instructed to "obtain[] the maximum commitment possible." *Id.* In the Ohio workplace, Plaintiffs had to end their engagement with the customer and leave the premises after initiating the verification call. They were unable to verify the commitment from the customers, address customer concerns or questions, or provide assurances to the customers. It is true that Plaintiffs were paid exclusively on commission, but unlike the New York solicitors in *Flood*, their commission income was minimal and they were not rewarded with additional benefits such as incentives to travel around the world. *See Flood*, 904 F.3d at 226. The totality of the circumstances in this Ohio workplace did not evidence the external indicia of salesmen that would support application of the exemption.

In determining whether the workers were "employed . . . in the capacity of outside salesman," 29 U.S.C. § 213(a)(1), the Supreme Court also considered whether a plaintiff's capacity "comports with the apparent purpose of the FLSA's exemption for outside salesmen." *Christopher*, 567 U.S. at 166. The Court explained that "[t]he exemption is premised on the belief that exempt employees 'typically earned salaries well above the minimum wage' and enjoyed other benefits that 'se[t] them apart from the nonexempt workers entitled to overtime pay.' Preamble 22124." *Id.* The pharmaceutical detailers there earned an average of more than $70,000 per year, including both a base salary and incentive pay, which was "well above the minimum wage"; they were "not required to punch a clock or report their hours, and they were subject to only minimal supervision." *Id.* at 151, 166. The pharmaceutical detailers also performed work that "was difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week." *Id.* at 166. The Court concluded that pharmaceutical detailers are "hardly the kind of employees that the FLSA was intended to protect." *Id.*

Plaintiffs' jobs do not fit this mold of independent workers managing their hours, territory, and income. Trial evidence showed they received no base pay and apparently made much less than minimum wage—a stark contrast to the lead plaintiff in *Flood* who earned more than $70,000 in commissions per year along with other benefits. *See Flood*, 904 F.3d at 226. Plaintiffs' pay was entirely dependent on completed sales, over which they had no control, and trial testimony and compensation data in the record showed that wages were both inconsistent and disproportionately low when compared to hours worked. Plaintiffs did not benefit from minimal supervision—their location and schedules were set and controlled by their supervisors and their selling procedures were dictated by the compulsory script and closely monitored via the compliance matrix. Plaintiffs' jobs did not comport with the apparent purpose of the outside sales exemption.

## C. Jury Instructions

Just Energy challenges the legal accuracy of the jury instructions, arguing that "authority to bind" should not be a consideration when applying the outside sales exemption. Erroneous jury instructions are generally reviewed for abuse of discretion, but we review the "legal accuracy" of jury instructions de novo. *United States v. Blanchard*, 618 F.3d 562, 571 (6th Cir. 2010).

On appeal, we "review jury instructions as a whole in order to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for aiding the jury to reach its decision." *United States v. Godofsky*, 943 F.3d 1011, 1027–28 (6th Cir. 2019) (quoting *United States v. Theunick*, 651 F.3d 578, 589 (6th Cir. 2011)). "Reversal of a jury verdict based on incorrect jury instructions is warranted only when the instructions, 'viewed as a whole, [are] "confusing, misleading, and prejudicial."'" *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009) (quoting *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 641 (6th Cir. 2005)). The district court instructed the jury:

> In determining whether a particular transaction qualifies as a sale for purposes of the Fair Labor Standards Act, you are required to consider the extent to which the employee has the authority to bind the company to the transaction at issue. However, when governmental regulatory requirements limit an employee's ability to bind his employer, compliance with those governmental regulatory

requirements do not disqualify the transaction from constituting a sale for the purposes of the outside salesperson exemption.

. . .

On the other hand, if the employer retains and/or exercises discretion to accept or reject any transactions for reasons that are unrelated to regulatory requirements applicable to the industry, the transaction should not be considered a sale for purposes of the Fair Labor Standards Act.

(R. 850, Trial Tr., PageID 15486-87)

The district court emphasized consideration of the *extent* of Plaintiffs' authority to bind, rather than instructing that the authority to bind is a prerequisite or determining factor. The court also clarified the importance of the relevant regulatory requirements applicable to the industry: if such requirements apply, Plaintiffs' authority to bind and Just Energy's discretion to accept or reject transactions will not disqualify the exemption. In this context, we disagree with our dissenting colleague's conclusion that this question should have been resolved solely on the undisputed fact that Just Energy retained discretion. Instead, it required the jury to evaluate "case-specific factual issues" in the context of the regulatory environment. *U.S. Bank*, 138 S. Ct. at 967. Read as a whole, the jury instructions are an accurate statement of the outside sales exemption as instructed by *Christopher*. The district court did not commit reversible error in its jury instructions.

### D. Evidence of Compensation

Just Energy challenges the admission of Plaintiffs' compensation into evidence, arguing that compensation is irrelevant to the outside sales exemption and unnecessary here because it had already stipulated to the fact that it did not pay minimum wage and overtime. Evidentiary rulings by the district court are reviewed for abuse of discretion. *United States v. Jamieson*, 427 F.3d 394, 409 (6th Cir. 2005).

In discussing its decision to admit compensation evidence, the district court noted that Plaintiffs have the burden to show that there is a failure to pay minimum wages and overtime pay. This is because Just Energy stipulated only that "they do not pay overtime for hours worked over 40 hours per week and do not pay minimum wage in situations where the commissions

earned during a particular workweek are insufficient to ensure that salespersons' wage rates meet or exceed the minimum wage." (R. 763, Stipulation & Order, PageID 11094) Just Energy did not stipulate that Plaintiffs actually earned less than minimum wage in commissions, or that they were entitled to overtime pay at all. Compensation information was therefore necessary for Plaintiffs to establish that they had minimum wage and overtime claims to begin with. Indeed, testimonial evidence showed that a number of plaintiffs worked long hours and received little or no pay. And as already noted, documentary evidence of over 3,800 individuals showed that 69% made under $1,000 in total compensation and 62% made under $500.

Compensation information was also relevant to other parts of the outside sales exemption analysis. Both the *Christopher* and *Flood* courts noted the yearly earnings of the plaintiffs; in *Christopher*, the Supreme Court referenced compensation information as part of the analysis of whether the plaintiffs fit the "apparent purpose of the FLSA exemption." *Christopher*, 567 U.S. at 166; *see also Flood*, 904 F.3d at 226. Plaintiffs' compensation evidence, including the size of the checks that individuals received, was also relevant to determine if and how commissions were paid, and by extension the amount of discretion that Just Energy exercised to accept or reject sales. The district court did not abuse its discretion by admitting compensation evidence as part of the analysis of the outside sales exemption.

### III. CONCLUSION

For the reasons stated above, we find no error in the challenged jury instructions and evidentiary rulings of the district court and **AFFIRM** the district court's denial of the motions for judgment as a matter of law and directed verdict.

————————

**DISSENT**

————————

MURPHY, Circuit Judge, dissenting. We must decide whether the plaintiffs are outside salespeople exempt from the requirements of the Fair Labor Standards Act (FLSA). The basic facts are largely undisputed: The plaintiffs go door-to-door convincing residents to buy natural gas or electricity from Just Energy. When a plaintiff convinces residents to do so, the residents sign "customer agreements" stating that they are choosing Just Energy for their energy. Given these facts, how would you describe the plaintiffs' occupation? Most people, I think, would naturally refer to them as "salespeople" who make door-to-door "sales." The plaintiff in a similar suit readily agreed as much. *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 225 (2d Cir. 2018). Here, however, the district court held that a jury could find that the plaintiffs were not outside salespeople. That is so, it said, largely because Just Energy could reject customer agreements after customers signed them.

With respect for my colleagues' contrary views, I would reverse. The district court erred twice over. And our failure to correct its errors creates a clear circuit conflict. *First*, the court wrongly treated the ultimate issue whether the plaintiffs were outside salespeople as a fact question for the jury, not a legal question for the court. Yet whether the "particular activities" of a group of employees "exclude[] them from the overtime benefits of the FLSA is a question of law[.]" *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *see Flood*, 904 F.3d at 227. This case thus raises a legal question: Do the plaintiffs' undisputed day-to-day activities qualify as "making sales" within the meaning of the outside-sales exemption? 29 C.F.R. § 541.500(a)(1)(i).

*Second*, the district court interpreted this "making sales" language too narrowly. *Id.* The Supreme Court has given it a broad reach, holding that pharmaceutical sales representatives "make sales" by getting nonbinding commitments from doctors to prescribe (not buy) drugs. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161–69 (2012). If those efforts qualify as "making sales," the plaintiffs' efforts to convince customers to purchase their energy from Just Energy do too. I see no textual basis for the district court's view that their activities do not

qualify as "making sales" simply because Just Energy can still back out of an agreement after a plaintiff convinces a customer to sign it. The Second Circuit rejected the same argument when concluding that a similar Just Energy employee made sales. *Flood*, 904 F.3d at 229–33. So two circuit courts are now holding the same company to conflicting legal mandates. That state of affairs is unsustainable. Either all of these Just Energy employees should receive the FLSA's protections or none should.

## I

## A

The FLSA requires employers to pay a minimum wage and overtime compensation. 29 U.S.C. §§ 206–07. But its protections do "not apply with respect to" "any employee employed . . . in the capacity of outside salesman" as that term is "defined and delimited from time to time by regulations of the Secretary" of Labor. *Id.* § 213(a)(1). (No party challenges this delegation of authority. *Cf. Gundy v. United States*, 139 S. Ct. 2116 (2019).) A regulation defines "outside salesman" to cover employees who (1) primarily engage in "making sales" and (2) typically work away from their employer's business. 29 C.F.R. § 541.500(a). It provides:

> (a) The term "employee employed in the capacity of outside salesman" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Whose primary duty is:
> (i) making sales within the meaning of section 3(k) of the Act, or
> (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

*Id.* This case concerns the "making sales" element. That element incorporates the statutory definition of "sale": "'Sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k); 29 C.F.R. § 541.501(b).

In *Christopher*, the Supreme Court interpreted "making sales" broadly because it uses this broad statutory definition. 567 U.S. at 162–64. The Court viewed the definition's list of covered items as "an attempt to accommodate industry-by-industry variations in methods of

selling commodities." *Id.* at 164. It thus read "the catchall phrase 'other disposition'" to reach "those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity." *Id.* Under this definition, the Court found that pharmaceutical sales representatives make sales by persuading doctors to prescribe drugs. *Id.* at 165–67. It held that a "nonbinding commitment" to prescribe a drug is an "other disposition." *Id.* at 165. It gave two additional reasons for this view. First, the representatives bore "external indicia" of salespeople, including that they were "hired for their sales experience," "worked away from the office, with minimal supervision," and "were rewarded for their efforts with incentive compensation." *Id.* at 165–66. Second, the exemption exists because outside salespeople typically make well over the minimum wage and work non-standard schedules. *Id.* at 166. These purposes supported the exemption's application because pharmaceutical sales representatives are paid well and often work irregular hours. *Id.*

B

This case involves the sale of energy rather than drugs. Just Energy Group and two subsidiaries, Commerce Energy and Just Energy Marketing, "sell electricity and natural gas to residential and commercial customers in the United States and Canada." *Hurt v. Commerce Energy, Inc.*, 92 F. Supp. 3d 683, 687 (N.D. Ohio 2015). (I refer to all defendants as "Just Energy" because their corporate distinctions do not matter here.) As part of Just Energy's "selling scheme," the plaintiffs "would go door to door to obtain applications from potential customers" to purchase electricity or natural gas. *Id.* Just Energy hired the plaintiffs "without regard to their prior sales experience" and "closely controlled [their] work schedules" by driving them to neighborhoods and telling them "how many doors to knock on per day." *Id.* at 689–90. It also gave the plaintiffs "detailed scripts to follow[.]" *Id.* at 691. And it paid them only commissions. *Id.*

As their primary duty, the plaintiffs persuaded residents to sign forms entitled "customer agreements" (what the district court called "applications," *id.* at 687). In an Ohio example of this form, a customer acknowledges: "I CHOOSE Commerce Energy d/b/a Just Energy to be my supplier of natural gas ("Gas") for the Term selected below." Yet the agreement does not *immediately* bind either side of the transaction. It tells customers they have the right to rescind it

for a significant period of time. It also is "conditional upon [Just Energy's] acceptance[.]" And Just Energy's "acceptance is at [its] sole discretion," depending in part on whether the customer is "creditworthy" and whether Just Energy can "verify [the customer's] information by recorded phone call[.]" After obtaining an agreement, a plaintiff would initiate this call and leave the customer's home so that the customer could speak with a third-party verifier to protect against fraud. The plaintiffs received a commission only if Just Energy later accepted the agreement.

The plaintiffs sued Just Energy for failing to pay them a minimum wage and overtime compensation. The district court certified a collective action under the FLSA and a class action under Ohio law. (The same standards apply to both claims.) The class plaintiffs worked for Just Energy in six states: Illinois, Ohio, Pennsylvania, Maryland, California, and New York.

At trial, the parties stipulated that the plaintiffs worked away from Just Energy's business. The trial thus addressed only whether the plaintiffs were "making sales." The court gave lengthy instructions on this element. It read the statutory definition of "sale" and noted that the jury's "decision should be [a] functional rather than formal inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works." Tr., R.850, PageID#15486. The court also stated that the jury must "consider the extent to which the employee has the authority to bind the company to the transaction at issue." *Id.* If an employer could reject a transaction "for reasons that are unrelated to regulatory requirements applicable to the industry," the court said, "the transaction should not be considered a sale[.]" *Id.*, PageID#15486–87. It next turned to *Christopher*'s "external indicia" of salespeople. It told the jury that it may "ask whether under the totality of the circumstances [these factors] suggest the plaintiffs were actually engaged in making sales." *Id.*, PageID#15487. It then ticked through various indicia, including, for example, whether "the employee was recruited based upon sales experience and ability[.]" *Id.*, PageID#15488.

The jury ruled for the plaintiffs. It answered "No" to the following question: "Have Defendants met their burden of demonstrating that Plaintiffs qualify as outside salespeople and are thus exempt from the legal requirement to pay minimum wage and overtime?" The district court denied Just Energy's motion for judgment as a matter of law for two reasons. *See Hurt*, 92 F. Supp. 3d at 689–93. It held that the "external indicia" "could easily support the jury's

verdict." *Id.* at 689. And it held that the plaintiffs "obtained only non-binding applications from customers[.]" *Id.* at 692. After a damages phase, the court entered a judgment against Just Energy for over $4.8 million.

II

The district court committed two errors. It wrongly asked the jury to answer a legal question. And when doing so, it misinterpreted the phrase "making sales."

A

The district court did not decide (one way or the other) whether the plaintiffs were outside salespeople. It instead held that, while the evidence could support a verdict in Just Energy's favor, sufficient contrary evidence existed "for the jury to reach the opposite conclusion[.]" *Hurt*, 92 F. Supp. 3d at 689, 693. The court wrongly viewed this question as one of fact rather than law.

1

This case raises a common problem about how to characterize "the application of a legal standard to settled facts." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068 (2020). That question arises only after one identifies the relevant "legal standard" and the relevant "facts." The correct decisionmakers for those two inquiries are obvious. Courts pick the "legal test" by deciding what a statute means. *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 965 (2018). And factfinders find the "'historical' fact[s]" by deciding "who did what, when or where, how or why." *Id.* at 966. Once we know the legal test and the historical facts, a decisionmaker must decide whether those facts satisfy that test—a "mixed question of law and fact." *Guerrero-Lasprilla*, 140 S. Ct. at 1069 (citation omitted). Do these mixed questions raise legal issues for courts or fact issues for juries? It depends. *U.S. Bank*, 138 S. Ct. at 966–67. If answering the question "require[s] courts to expound on the law," courts treat it as legal. *Id.* at 967; *cf. Ornelas v. United States*, 517 U.S. 690, 697 (1996). If answering the question "immerse[s] courts in case-specific factual issues," courts treat it as factual. *U.S. Bank*, 138 S. Ct. at 967; *cf. Monasky v. Taglieri*, 140 S. Ct. 719, 730 (2020).

This analysis leads us to the proper question here: Does deciding whether undisputed job duties fall within an FLSA exemption "entail[] primarily legal or factual work"? *U.S. Bank*, 138 S. Ct. at 967. The Supreme Court has told us it is legal. *Icicle*, 475 U.S. at 714. *Icicle* addressed the exemption for "any employee employed as a seaman[.]" 29 U.S.C. § 213(b)(6). The plaintiffs, engineers on a seafood-processing barge, worked to ensure the barge's continuous operation. *Icicle*, 475 U.S. at 711. After a bench trial, the district court found them exempt. *Id.* The Ninth Circuit reversed on de novo review. *Id.* at 710. The Supreme Court, in turn, reversed because the Ninth Circuit wrongly made "factual findings" about the historical facts. *Id.* at 714. It explained that what the employees did from day to day raised a *question of fact* subject to clear-error review. *Id.* But it then said: "The question whether their particular activities excluded them from the overtime benefits of the FLSA is a *question of law* which both parties concede is governed by the pertinent regulations[.]" *Id.* (emphasis added). It added that the appellate court could have reversed the district court—even assuming that the "factual findings were unassailable"—if it had found that the "proper rule of law was misapplied to those findings[.]" *Id.*

We have adopted *Icicle*'s dichotomy since. While we review a district court's "findings of fact for clear error," we "review de novo the district court's application to those facts of the legal standards contained in [FLSA] statutes, regulations, and caselaw." *Brock v. City of Cincinnati*, 236 F.3d 793, 800 (6th Cir. 2001); *Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 691 (6th Cir. 2001); *Martin v. W.E. Monks & Co.*, 1993 WL 300332, at *2 (6th Cir. Aug. 3, 1993); *Spencer v. Office of the Auditor of Pub. Accounts*, 1991 WL 32361, at *1 (6th Cir. Mar. 12, 1991).

Other courts agree. "The exemption question under the FLSA is a mixed question of law and fact. The question of how the employees spent their working time is a question of fact. The question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." *Pippins v. KPMG, LLP*, 759 F.3d 235, 239 (2d Cir. 2014) (citation omitted); *Robinson-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 891–92 (D.C. Cir. 2010); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 584 (5th Cir. 2006); *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004); *Ackerman v. Coca-Cola Enters., Inc.*, 179 F.3d 1260,

1264 (10th Cir. 1999); *Spinden v. GS Roofing Prods. Co.*, 94 F.3d 421, 426 (8th Cir. 1996).  If the facts are undisputed, courts regularly grant summary judgment to employers (finding that an exemption applies), *Pippins*, 759 F.3d at 240, 252; *Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1308–10 (11th Cir. 2009), or employees (finding that an exemption does not apply), *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 120, 130 (4th Cir. 2015); *Clements v. Serco, Inc.*, 530 F.3d 1224, 1229 (10th Cir. 2008).

2

Now apply this framework here.  We must start by identifying the "legal test."  *U.S. Bank*, 138 S. Ct. at 965.  As noted, the outside-sales exemption has two parts.  29 C.F.R. § 541.500(a).  And it is our job to figure out (without the slightest deference to the jury) what the first part means when it says that employees must have a primary duty of "making sales within the meaning of section 3(k) of the Act[.]"  *Id.* § 541.500(a)(1)(i).  Did the district court correctly hold that "making sales" requires employees to have the authority to bind their employer to a sale?  Did it correctly interpret that phrase to depend on the "external indicia" of salespeople?  These are purely legal questions.  (I think the district court got them wrong, but set that aside for now.)

Next consider the "historical facts."  *U.S. Bank*, 138 S. Ct. at 966.  If the parties disputed any of the activities that the plaintiffs did on a day-to-day basis, that factual dispute would certainly be for the jury to resolve.  Yet I do not see much disagreement on these facts.  There is no dispute that the plaintiffs regularly worked away from Just Energy's offices.  29 C.F.R. § 541.500(a)(2).  And there is no dispute about the plaintiffs' "primary duty": to persuade residents to sign forms agreeing to buy their energy from Just Energy.  *Id.* § 541.500(a)(1).

The parties debate only whether these solicitations rise to the level of "making sales." *See id.* § 541.500(a)(1)(i).  For this question, too, the historical facts are largely undisputed.  The plaintiffs, for example, did not need sales experience and Just Energy closely controlled their work.  *Hurt*, 92 F. Supp. 3d at 689–90.  Both the customers and Just Energy could later reject agreements that the plaintiffs convinced customers to sign.  *Id.* at 692–93.  And the plaintiffs were paid only on a commission basis and only if neither party rejected the agreement.  *Id.* at

687. All told, this case strikes me as one in which the "tasks performed by" the employees are "essentially agreed by the parties" and they instead dispute only whether those tasks "exclude[] them from the overtime benefits of the FLSA." *Pippins*, 759 F.3d at 240 (quoting *Icicle*, 475 U.S. at 714). The case thus raises "a question of law." *Id.* (quoting *Icicle*, 475 U.S. at 714).

*Christopher* bolsters my view. That case arose on summary judgment. 567 U.S. at 152. The Court first clarified the meaning of "making sales," a legal question. 567 U.S. at 161–64 (Part II.C.1). It then applied its test to the sales representatives' duties, a mixed question of law and fact. *Id.* at 165–67 (Part II.C.2). When doing so, the Court did not frame this question as whether a reasonable jury could find that the representatives were (or were not) "making sales" under its test. The Court applied the test itself. *Id.* Yet if *Christopher*'s "application of a legal standard to settled facts" was really for the jury, I find it difficult to see how that case did not at least raise a triable issue. *Guerrero-Lasprilla*, 140 S. Ct. at 1068; *see also Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140–43 (2018) (finding employees exempt at pleading stage).

The Second Circuit likewise treated this question as for the court in a nearly identical case. *Flood*, 904 F.3d at 228. The plaintiff in *Flood* worked for two of the same Just Energy companies in New York. He had largely the same duties as the plaintiffs here, but the district court found that these duties qualified as "making sales" on summary judgment. *Id.* at 224–26. On appeal, the Second Circuit said: "The question of how an employee spends his or her time working is one of fact, while the question of whether those work activities exempt him or her from the FLSA is one of law." *Id.* at 227. It then explained why the plaintiff made sales as a matter of law. *Id.* at 229.

Frankly, I do not see the need for a trial even under the district court's view of the law. Its instructions read as if the court was asking the jury to answer a question of statutory interpretation. The instructions told the jury to consider the text of the "sales" definition and the purpose-based indicia from *Christopher*. Yet the instructions then added a legal gloss nowhere found in *Christopher*, stating: "[I]f the employer retains and/or exercises discretion to accept and/or reject any transaction for reasons that are unrelated to regulatory requirements applicable to the industry, the transaction should not be considered a sale[.]" Tr., R.850, PageID#15487. There is no dispute that Just Energy retained the discretion that the instructions prohibited. So

the district court's view of the law should have led it to enter judgment as a matter of law for the plaintiffs. Either way, whether the plaintiffs are exempt or non-exempt, this "making sales" question is for the court.

B

Even if this mixed question of law and fact were for the jury, the proper meaning of the outside-sales exemption raises a pure legal question for the court. *U.S. Bank*, 138 S. Ct. at 965. And no reasonable jury could return a verdict for the plaintiffs under a correct view of the law.

1

Like the Second Circuit, I believe that these Just Energy employees were "undoubtedly 'making sales' within the scope of the outside salesman exemption" when they engaged in their door-to-door solicitations. *Flood*, 904 F.3d at 229. I reach this conclusion based on the plain text, the nearby outside-sales regulations, the FLSA as a whole, and the most relevant caselaw.

a. The text's plain meaning shows that the plaintiffs "made sales." The phrase "making sales" has two requirements: there must be a result (a "sale") and an employee's activities must have enough of a connection to that result (the employee must "make" the sale). The Supreme Court recently rejected the once common view "that exemptions to the FLSA should be construed narrowly." *Encino*, 138 S. Ct. at 1142. So we must interpret these words as we would any other text—by giving them a "fair reading," not a restrictive one. *Id.*

When fairly read, both words have a broad meaning. Start with "sales." The regulation incorporates the statutory definition of "sale." Far from covering only the technical "exchange of a commodity for money," 9 *Oxford English Dictionary* 49 (1933), this definition "includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition," 29 U.S.C. § 203(k). By using the verb "include," the definition clarifies that its nonexclusive list does not identify all arrangements that qualify as "sales." *See Christopher*, 567 U.S. at 162. And by using the adjective "any," the definition clarifies that every kind of the listed items qualifies as a "sale." *See id.* To have separate meaning, moreover, the catchall "other disposition" must cover more than "a 'firm agreement' or 'firm commitment' to buy"

because those things already fall within the phrase "contract to sell." *Id.* at 163 & n.20 (citation omitted).

The word "making" next identifies the connection an employee must have to a "sale." It has a broad meaning too. In one sense, a person "makes" a sale if the person "cause[s]" the sale or "brings" it "about." *Webster's New International Dictionary* 1485 (2d ed. 1934) (def. 18); 6 *Oxford English Dictionary* at 61 (def. 9). In another sense, the entire phrase ("making sales") can be read simply as "selling." When a sentence uses the verb "make" with an object that can take a verb form ("to make a statement"), the combined phrase can have the same meaning as that verb form ("to state"). *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (citing 6 *Oxford English Dictionary* at 66 (def. 59)). This view does not change things. While "sell" can have a technical meaning ("[t]o transfer (property) for a consideration"), *Webster's*, *supra*, at 2272 (def. 7), that narrow meaning would not fit the regulation's broad definition of "sell," 29 U.S.C. § 203(k). In this setting, "selling" should cover those who "persuade" customers "to a course of action" (a sale), *Webster's*, *supra*, at 2272 (def. 14), or who "cause or further" the sale, *id.* (def. 8); 9 *Oxford English Dictionary* at 429 (def. 3.c).

This meaning fits the context. *United States v. Hill*, 963 F.3d 528, 533 (6th Cir. 2020). The regulation uses "making sales" to describe those who are "outside salesmen." *Cf. Johnson v. United States*, 559 U.S. 133, 140 (2010). In that context, "making sales" naturally refers to those who persuade people to buy things. Most people, for example, would say that a "car salesman" who convinces a customer to buy a car is the one who "makes" the "sale" even if the customer then reviews the paperwork with the dealership's financial staff. *Christopher*, 567 U.S. at 167.

Turning to this case, the plaintiffs' duty to persuade customers to buy energy from Just Energy fits within this plain meaning of "making sales." Is there a "sale" involved? Yes. Unlike *Christopher*, we need not even concern ourselves with the catchall "other disposition." *See* 567 U.S. at 165. The arrangement here falls within a specific item—"contract to sell." 29 U.S.C. § 203(k). Did the plaintiffs "make" these contracts? Yes, again. I agree that Just Energy could decline to enter a contract after the plaintiffs convinced a customer to sign an agreement. But the plaintiffs were the ones who "brought about" any later finalized contracts by

"persuading" customers to enter them. *See Webster's*, *supra*, at 1485, 2272. The text requires nothing more.

In the alternative, the plaintiffs undoubtedly brought about ("made") the customers' offers to purchase by convincing them to sign the agreements memorializing those offers. Does an offer to buy a good qualify as a "sale"? Even if it is not a "contract to sell" because Just Energy could reject the offer, it fits within the "other disposition" catchall. *See Christopher*, 567 U.S. at 163–64. An offer to buy is essentially an "order" for goods. *See id.* (defining "disposition"). And the very next provision clarifies that "orders" "for services" are covered. 29 C.F.R. § 541.500(a)(ii). It would make little sense to read § 541.500(a)(ii) as reaching non-contractual orders for *services* while reading § 541.500(a)(i) as excluding non-contractual orders for *goods*.

b. Nearby outside-sales regulations also show that the plaintiffs were "making sales." These regulations distinguish those who make their *own* solicitations from those who promote the sales of *others*. And the plaintiffs were making their "own" solicitations.

The Department of Labor has traditionally distinguished salespeople from "promotion men" working for manufacturers. U.S. Dep't of Labor, Wage & Hour Div., Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition 46 (1940) ("1940 Report"). These promoters would visit retail stores to "put[] up displays and posters, remov[e] damaged or spoiled stock from the merchant's shelves or rearrang[e] the merchandise." U.S. Dep't of Labor, Wage & Hour & Public Contracts Divs., Report and Recommendations on Proposed Revisions of Regulations, Part 541, 82–83 (1949) ("1949 Report"). The Department concluded that they were not salespeople because their activities were "designed to stimulate sales which will be made by someone else[.]" *Id.* at 83. If, by contrast, an employee was "actually engaged in activities directed toward the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling," the employee was exempt. *Id.*

A "promotion work" regulation codified this distinction. It says that the exemption reaches promotion work performed "in conjunction with an employee's own outside sales or

solicitations[.]" 29 C.F.R. § 541.503(a). But the exemption does not reach promotional work "that is incidental to sales made, or to be made, by someone else[.]" *Id.* The regulation gives as an example of the latter an employee who visits "chain stores" to arrange goods and replenish stock but "does not obtain a commitment for additional purchases." *Id.* § 541.503(c). These actions are not "making sales" because the employee "does not consummate the sale nor direct efforts toward the consummation of a sale[.]" *Id.* Another regulation, by comparison, suggests that a delivery driver makes sales if the driver "obtains or solicits orders for the employer's products from persons who have authority to commit the customer for purchases." *Id.* § 541.504(c)(2). In the guidance with these regulations, the Department reiterated that "making sales" should cover employees who "'obtain a commitment to buy' from the customer and are credited with the sale." 69 Fed. Reg. 22122, 22162 (Apr. 23, 2004) (quoting 1949 Report, at 83).

This dichotomy likewise shows that the plaintiffs "made sales." They engaged in their own "solicitations" when they went door-to-door to convince customers to buy energy, obtaining their own "orders" and "direct[ing] [their] efforts toward the consummation of" their own sales. 29 C.F.R. §§ 541.503(a), (c), 541.504(c)(2). They also sought to "obtain a commitment to buy" (the customer agreements) and were "credited" with finalized contracts (through their commissions). 69 Fed. Reg. at 22162. Conversely, the plaintiffs have identified no other Just Energy employees who "made" these sales. They have not argued that the third-party verifiers did so. For good reason. Those verifiers existed to stop sales, not make them. They ensured that the plaintiffs had disclosed all required information and had not engaged in fraud. *Cf. Flood*, 904 F.3d at 225.

c. A broader view of the FLSA supports this conclusion too. The outside-sales exemption relies on "a general definition" of sale "that applies throughout the FLSA." *Christopher*, 567 U.S. at 164 n.21. We should consider how the statute uses the word "sale" or "sell" elsewhere. After all, courts presume that the same word does not change meanings across a statute. *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 60 (2014). That principle has even more force when the word comes with a universal definition. *See* 29 U.S.C. § 203(k).

So I find it noteworthy that Congress broadened the FLSA's reach in 1961 to cover businesses that have "employees handling, *selling*, or otherwise working on goods or materials

that have been moved in or produced for commerce by any person[.]" 29 U.S.C. § 203(s)(1)(A)(i) (emphasis added); *Sec'y of Labor v. Timberline S., LLC*, 925 F.3d 838, 843–45 (6th Cir. 2019). How does the Secretary of Labor interpret "selling" in this provision? The Secretary broadly defines the word to match the plain meaning I have given to "making sales": "As long as the employee in any way participates in the sale of the goods he will be considered to be 'selling' the goods, whether he physically handles them or not." 29 C.F.R. § 779.241. "Thus, if the employee performs any work that, in a practical sense is an essential part of consummating the 'sale' of the particular goods, he will be considered to be 'selling' the goods." *Id.*

Would anyone challenge that the plaintiffs were "selling" under this definition? They "participate" in obtaining the contracts to sell by discovering one side of those contracts. And they are an "essential part" of completing the contracts that Just Energy finalizes. Without the plaintiffs, there would be no purchasers—and hence no contracts. It does not get more essential than that.

To be sure, the Fifth Circuit fifty years ago rejected reliance on this regulation because it concerns the FLSA's coverage, not an exemption. *Wirtz v. Keystone Readers Serv., Inc.*, 418 F.2d 249, 261 (5th Cir. 1969). But *Wirtz* rests on since-overruled logic. It said: "Given the rule that coverage provisions are to be *liberally* construed while exemptions are to be *narrowly* construed, definitions for one purpose would seem ill suited to the other." *Id.* (emphases added). Not anymore. The Supreme Court recently clarified that the FLSA's exemptions are just as much a part of Congress's legislative compromise as are its coverage provisions. *Encino*, 138 S. Ct. at 1142. Both are entitled to the same "fair reading," not to an overly broad or overly narrow one. *Id.*

d. Relevant precedent removes all doubt. As noted, the Second Circuit found that a similar Just Energy employee fell within the exemption. *Flood*, 904 F.3d at 229. It reasoned that the plaintiff "was not just promoting these products or advertising them; he was trying to persuade specific customers to sign up then-and-there for an energy plan." *Id.* The court found that he made sales because he "obtain[ed] a commitment to buy from the customer and [was] credited with the sale." *Id.* (citation omitted). It also rejected the claim that the plaintiff did not

make sales because Just Energy could reject an agreement. "We do not agree that the outside salesman exemption requires a showing that a selling employee has an unconditional authority to bind the buyer or his employer to complete the sale." *Id.* This case is legally identical to *Flood*.

Apart from *Flood*, the reasoning of all nine Justices in *Christopher* shows that the plaintiffs made sales. The majority held that a "nonbinding commitment" to prescribe a drug qualifies as an "other disposition" and so a "sale." 567 U.S. at 165. A nonbinding agreement to buy energy looks even more like a "sale" than a nonbinding commitment to prescribe a drug. As *Flood* noted, the plaintiffs' duties are "more in the nature of 'making sales' than the primary duties of the representatives at issue in *Christopher*." 904 F.3d at 231. If those representatives are exempt, the plaintiffs must be too. In fact, even the *Christopher* dissent believed that the exemption covered those who "obtain a firm commitment to buy the product." 567 U.S. at 178 (Breyer, J., dissenting). The signed customer agreements strike me as a firm commitment to buy energy from Just Energy.

2

The district court and the majority reach a contrary result for two reasons: The plaintiffs could not bind Just Energy to the contracts and they did not bear all the "external indicia" of salespeople. Neither reason removes the plaintiffs from the outside-sales exemption's reach.

*Authority to Bind*. The district court held that the plaintiffs do not "make sales" because Just Energy and its customers could both stop a deal after a customer signed an agreement. *See Hurt*, 92 F. Supp. 3d at 692–93, 696–97. I do not understand why this fact should disqualify the plaintiffs. Neither text nor precedent supports the district court's rule.

Start with the text. It does not require the employee to *consummate* or *complete* the sale; it requires the employee to *make* the sale. And the plaintiffs "make" the "contracts to sell" that Just Energy enters with consumers even if the contracts do not get finalized until later and even if some fall apart. The phrase "making sales" naturally captures the employees who "persuade" customers to buy the employer's products, *Webster's*, *supra*, at 2272 (def. 14), even if the actual exchange occurs later in coordination with others, *Christopher*, 567 U.S. at 167–68. Nearby regulations confirm this view. They say employees are covered if they "solicit[] orders" or

engage in "solicitations." 29 C.F.R. §§ 541.503(a), 541.504(c)(2). Who else at Just Energy undertakes these acts of persuasion if not the plaintiffs? The plaintiffs certainly identify no one else.

Consider some hypotheticals. The exemption covers those who "'obtain a commitment to buy'" or an "order." 69 Fed. Reg. at 22162 (citation omitted); 29 C.F.R. § 541.504(c)(2). What happens if salespeople are required to say that their employer's filling of any order depends on it having available stock ("while supplies last")? Does that disclaimer disqualify them from making sales because they do not "bind" their employer to sales? I would think not. The exemption requires a commitment to *buy*, not a commitment to *sell*. The exemption likewise covers salespeople who convince a retailer to buy a load of product even if the retailer makes the purchase "through [its] internal computerized purchasing system," not the salespeople themselves. 69 Fed. Reg. at 22162. The retailer obviously could change its mind in between when it gives a commitment to salespeople and when it "types the order into [its] computer system and hits the return button[.]" *Christopher*, 567 U.S. at 149 (quoting 69 Fed. Reg. at 22163). Does that discretion disqualify the salespeople from making sales because they do not get on-the-spot "binding" commitments? Again, I think not. More basically, many retail stores have generous "return" policies that allow customers to return purchased items no questions asked. Does a salesperson who convinces a customer to buy a product "make sales" even though the sale is not "binding" after the customer leaves the store? It would be quite strange to say that the salesperson is not making sales.

Turn to precedent. *Christopher* rebuts any argument that employees must have on-the-spot authority to bind their employers. *Flood*, 904 F.3d at 229–31. The Court "declined to interpret the 'making sales' requirement to mandate a showing that an employee has fully consummated a sales transaction or the transfer of title to property." *Id.* at 229. It instead held that a doctor's "*nonbinding* commitment" sufficed. 567 U.S. at 165 (emphasis added). The sales representatives likewise did not have the ability to bind their companies to sell prescription drugs to patients. The patients instead bought the drugs from separate entities—pharmacies. *See id.* at 167 & n.24.

My colleagues say we may disregard *Christopher* because of the "unique" regulatory environment for prescription drugs. The plaintiff in *Flood* made this argument too. I find it no more persuasive than the Second Circuit did: "*Christopher* does not . . . suggest that its reasoning and interpretation of the statute and regulations lack general applicability to other cases[.]" 904 F.3d at 231. And the plaintiffs point to nothing in the "energy industry that should warrant a more restrictive application of the term 'making sales[.]'" *Id.* They also point to nothing in the text that draws this regulated-nonregulated line. Either nonbinding commitments count or they do not.

The majority also suggests that *Killion v. KeHE Distributors, LLC*, 761 F.3d 574 (6th Cir. 2014), supports its narrow view of *Christopher*. But *Killion* did not address whether employees must have authority to bind employers. It addressed which of two sets of employees made sales. KeHE, a distributor of food to retailers, treated its "sales representatives" as exempt. 761 F.3d at 577–78. But the historical facts could be read to suggest that it was the "account managers" who "determine[d] which products will be sold in the chain stores and who [were] responsible for growing sales[.]" *Id.* at 584. Those facts also could be read to suggest that the sales representatives merely stocked the shelves of the retailers and ordered new product when the stores depleted their inventories. *Id.* at 578. Under this view of the facts, the representatives were mere "promoters" facilitating the account managers' sales. *See* 1940 Report, at 46; *Killion*, 761 F.3d at 585; *Wirtz*, 418 F.2d at 261. Here, by contrast, no other employees "really" persuaded residents to contract with Just Energy. It was the plaintiffs who did so.

My colleagues also compare this case to the Tenth Circuit's decision in *Clements*. There, the court held that a company's civilian employees who recruited soldiers for the U.S. Army did not "make sales" as a matter of law. 530 F.3d at 1229. *Clements* reasoned that the recruiters did not obtain an "order or contract" to enlist and "merely cultivated 'a list of persons who seem[ed] receptive to the idea' of joining the Army." *Id.* at 1228 (quoting *Wirtz*, 418 F.2d at 260). I agree that *Clements* relied on the fact that the recruiters lacked the authority to "enlist a recruit" into the Army—authority reserved to the Army itself. *Id.* at 1229. But if *Clements* relied on the *nonbinding* nature of any commitment from recruits, its logic does not survive *Christopher*'s holding that a "nonbinding commitment" counts. 567 U.S. at 165. Notably, *Christopher* did not

mention this aspect of *Clements* when distinguishing it, explaining that the case "concerned employees who were more analogous to buyers than to sellers." *Id.* at 168. The "more fundamental reason" recruiters are not salespeople "is that the activity of recruiting employees is not 'sales'"; recruiters help the Army *buy* services. *Clements*, 530 F.3d at 1231 (McConnell, J., concurring). *Clements* also relied on the overruled principle that the exemption should be "narrowly construed." *Id.* at 1227 (majority op.) (citation omitted). Here, the plaintiffs *sell* energy and we must give the exemption a fair reading, not a narrow one. *See Encino*, 138 S. Ct. at 1142.

While mistakenly relying on far-afield decisions, the majority fails to distinguish the case directly on point—*Flood*. My colleagues agree that *Flood* found a similar Just Energy employee covered because he obtained commitments to buy. Maj. Op. 11–12. But they distinguish *Flood* because the plaintiff was less controlled and made more money. *Id.* at 12–13. These differences do not matter. Under *Flood*'s test, the plaintiffs are exempt because they obtain commitments to buy. Indeed, the customer agreements in that case gave Just Energy the same "discretion" to reject agreements that exists in this one. *See* Ex. M, *Flood v. Just Energy Mktg. Corp.*, No. 7:15-cv-02012 (S.D.N.Y. Feb. 8, 2016), ECF No. 66-35. And the outside-sales exemption contains no salary requirement. "[T]he regulations do not indicate that a court should consider a salesman's effective compensation in determining whether the exemption applies." *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 586 (5th Cir. 2013). From the beginning, the Department of Labor has recognized that there is no "salary qualification" even though outside salespeople often can earn little in a week. 1940 Report, at 52. In short, we are creating a clear circuit split.

*External Indicia*. The district court also held that the plaintiffs do not bear all of the "external indicia" of salespeople that *Christopher* used to find pharmaceutical sales representatives exempt. *Hurt*, 92 F. Supp. 3d at 690–92. It wrongly relied on these indicia. The indicia might *qualify* employees for this exemption even if the employees' duties fall outside the ordinary meaning of "sales" work. But they cannot *disqualify* employees like the plaintiffs who have duties falling squarely within that ordinary meaning. Both text and precedent again support my view.

As for the text, "no such listing of indicia appears in the relevant regulation defining what it means for an employee to be 'making sales.'" *Flood*, 904 F.3d at 233. If an employee is indisputably "making sales" (say, for example, by going door-to-door to convince residents to buy a product on the spot), that employee falls within the exemption *without more*. 29 C.F.R. § 541.500(a)(1)(i). It cannot matter that an employee has no sales experience or that the employer supervises this work. To add such implied conditions on top of the express text would "disregard" basic "rules of statutory interpretation." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). In my view, the text instead reserves these "indicia" for atypical sales work. The definition of "sale" contains a vague catchall ("other disposition") and is non-exhaustive because it begins with "includes." *Christopher*, 567 U.S. at 162–64. So the definition can plausibly reach some arrangements that would not ordinarily be understood as "sales." How should courts go about deciding whether atypical arrangements qualify as "sales" under the broad definition? It seems to me the text permits courts to use these external indicia of outside salespeople to differentiate nontraditional sales that fall within the exemption from those that do not.

As for precedent, both *Christopher* and *Flood* support this distinction. On the one hand, *Flood* shows that plaintiffs cannot use the external indicia to disqualify employees who otherwise fall within the exemption. *Flood*, 904 F.3d at 233–35. It recognized that the plaintiff there (like the plaintiffs here) did not satisfy one external indicia of outside sales work—lack of supervision—because he "had to work prescribed hours," "was driven to and from pre-selected locations by company personnel," "had to abide by a company dress code," and "had to use a company sales script." *Id.* at 234. But this supervision did not change the fact that he made sales under the regulation's plain text. *Id.* And that text did not permit the court "to add a 'subject to supervision' exception to the 'making sales' requirement[.]" *Id.* at 235. The same logic applies here.

On the other hand, *Christopher* shows that the external indicia can be used to cover transactions that would not otherwise be considered "sales." An employee's effort to obtain a "nonbinding commitment from a physician to prescribe" a drug falls well outside the ordinary meaning of "sales." 567 U.S. at 165. So the Court relied on the broad "other disposition"

catchall to find that effort covered. *Id.* at 164–65. When doing so, it relied on these "external indicia" to confirm that the pharmaceutical sales representatives were exempt. *Id.* at 165–66. Here, however, there is no need to rely on the external indicia because the plaintiffs' work falls squarely within "making sales." These "indicia" are irrelevant in this case.

For these reasons, I would reverse the district court's judgment and direct it to enter a judgment for Just Energy on remand. I thus respectfully dissent.